**FILED**

JUN 1 1 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

CORAZON S. PASCUAL
MAIL ADDRESS:
P.O. BOX 471454
SAN FRANCISCO, CA 94147 Plaintiff,

vs.

MICHAEL J. ASTRUE
COMMISSIONER
SOCIAL SECURITY ADMINISTRATION
6401 SECURITY BLVD
BALTIMORE, MD 21235 Defendant(s).

CV 08    CASE NO.    2906

SBA

**EMPLOYMENT DISCRIMINATION COMPLAINT**

1.    Plaintiff resides at: SAN FRANCISCO, CA

MAIL
Address  P.O. BOX 471454

City, State & Zip Code SAN FRANCISCO, CA 94147

Phone 415- 409-6679

2.    Defendant is located at: SOCIAL SECURITY ADMINISTRATION
Address  6401 SECURITY BLVD

City, State & Zip Code BALTIMORE, MD 21235

3.    This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employ-

ment discrimination. Jurisdiction is conferred on this Court by 42 U.S.C. Section 2000e-5.

Equitable and other relief is sought under 42 U.S.C. Section 2000e-5(g).

4.    The acts complained of in this suit concern:

    a. __ Failure to employ me.

    b. X Termination of my employment.

Form-Intake 2 (Rev. 4/05)            - 1 -

c. __ Failure to promote me.

d. __ Other acts as specified below.

_____

_____

_____

_____

_____

_____

5.    Defendant's conduct is discriminatory with respect to the following:

a. __ My race or color.

b. __ My religion.

c. __ My sex.

d. _X_ My national origin.

e. _X_ Other as specified below.

_AGE & WORKPLACE HARASSMENT._

6.    The basic facts surrounding my claim of discrimination are:

_(PLEASE SEE THE ATTACHED DOCUMENTS)_

_____

_____

_____

_____

_____

_____

_____

7.    The alleged discrimination occurred on or about _October/2006 - March/2007_

                                  (DATE)

8.    I filed charges with the Federal Equal Employment Opportunity Commission (or the

California Department of Fair Employment and Housing) regarding defendant's alleged

Form-Intake 2 (Rev. 4/05)            - 2 -

1  discriminatory conduct on or about  _NA_____.

2                                     (DATE)

3  9.     The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter

4  (copy attached), which was received by me on or about  _NA_____.

5                                     (DATE)

6  10.    Plaintiff hereby demands a jury for all claims for which a jury is permitted:

7         Yes _X_    No ____

8  11.    WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,

9  including injunctive orders, damages, costs, and attorney fees.

10

11  DATED: _June 5, 2008____     _Corazon X Pascual_____

12                                     SIGNATURE OF PLAINTIFF

13

14  *(PLEASE NOTE: NOTARIZATION*     _Corazon S. Pascual_____

15  *IS NOT REQUIRED.)*                   PLAINTIFF'S NAME

16                                     (Printed or Typed)

17

18

19

20

21

22

23

24

25

26

27

28

Form-Intake 2 (Rev. 4/05)            - 3 -

## <u>DISCRIMINATION CASE  (SSA FILE NO.:  SF-07-426-SSA, DOF: 05-21-07)</u>

Mr. Chester Kleinman,  a  policy advisor for the Social Security Administration-Office  for  Civil Rights and Equal Opportunity (SSA-OCREO),   claimed that he processed the analysis of the above-referenced case and made the decision in the case, thereafter.    Evidently,  Mr. Kleinman's  numerous  mistakes  in his analysis and evaluation of the  case issues , as shown in the  attached Agency's decision letter dated  04/14/08  signed by the Acting Associate Commissioner,  Ms. Tina Waddell, and also shown in  his  attached  04/22/08 letter, led him to create an  erroneous and biased decision in my case.

Mr. Kleinman,  in his  04/22/08 letter,  reiterated  the  allegations  of the  Social Security Administration San Francisco-Office of Disability and Adjudication Review  (SSA SF-ODAR)  management's  team members (Chief Judge Benjamin Parks, Hearing Office Director Emily Montuya, Supervisors Jenita Ford and Eric Jimenez)  without  presenting an  evidence to prove  if the  management's  charges against me  were true or not.    As explained in my attached  05/13/08 letter,   Mr. Kleinman  has  failed to justify with evidence his analysis  and evaluation of the case.   He appeared to have made a decision in my  case contrary to a decision that has  a mature reasoned response in the light of the  total truth of the case issues. Of course,  I respect the conscience of Mr. Kleinman,  even if the  truth differ  with him,  however,  the point of the matter  here  is that we are trying  to seek  justice based on  facts and  evidence  through  the investigation process,  or,  Mr. Kleinman is  defeating the real  purpose of  the  Office for Civil Rights and Equal Opportunity (OCREO).

FILE NO.: SF-07-0426-SSA, DOF: 05-21-07

CORAZON S. PASCUAL
Mail Address: P. O. Box 471454, San Francisco, CA 94147
Home Tel.: 415-409-6679, Email:  corazonspascual@hotmail.com


(Revised: 05/14/08)

May 13, 2008


Mr. Chester Kleinman, Senior Attorney & Policy Advisor
SSA-Office for Civil Rights & Equal Opportunity
Baltimore, MD 21235

Dear Mr. Kleinman:

Till today I do not have yet your letter regarding the above-referenced case, which the
Director of Complaints Processing Center, Mr. Arthur Horton, said you mailed me on
04/22/08.   Thanks to him for sharing me a copy of your letter.   It could have been
better if,  with your discretion,  your  letter was  sent  via e-mail or via FEDEX or as a
registered mail  because  it  contains confidential information about me and the
Agency's.

Please note that, in addition to my age and national origin discrimination complaint, I
included the issues of workplace harassment, and the contract investigator also covered
my employment termination, as shown in the Investigative File (IF).   Also, please be
informed that my complaint is more directed to you, Mr. Kleinman,  than to the contract
investigator, Mr. Michael Fleury,  as explained later in this report.  Thus,  because I
value people's  fairness in dealing with issues, I have thought to respond to your analysis
and evaluation of the case issues, as shown in the decision letter dated 04/14/08, signed
by the Acting Associate Commissioner, Ms. Tina Waddell,   and also in your 04/22/08
letter.


DISCUSSION OF THE CASE

1.    In your analysis  and evaluation of the case issues,  as shown in the  attached
04/14/08 decision letter, you stated that I did not offer additional evidence to refute the
SF-ODAR management's  reasons for terminating my employment.  I responded via my
04/19/08  e-mail to Mr. Horton  that I have a bundle of evidence which the contract
investigator had missed to request from the SF-ODAR management  people  who are

Page 2/87(C. Pascual's 05/13/08 Letter to C. Kleinman's)

still withholding my evidence. I mentioned further that those evidence could have served to refute further the management's issues regarding my work performance. But then you said in your 04/22/08 letter (p.8, 1st para), as attached, that you do not believe my correspondence evidence would be useful in establishing whether or not I was discriminated against by the management. Here, your statements show inconsistencies in deciding which evidence to consider and believe in.


(2) Agency's (SSA) Policies for Probationary Employees VS C. Kleinman's.

On page 1, 4th paragraph of your 04/22/08 letter, you reminded me that, as a probationary employee, I had limited rights and could be terminated without undue formality. Then you also stated that your final determinations to reach a decision must comport your interpretations of the relevant evidence and the laws you enforce. Mr. Kleinman, unless you have already proven with evidence that I was at fault, as the management has alleged, the laws you enforced in my case may not be in accordance with the set of rules of the Agency's (SSA), because your assumed laws may contradict the Agency's (SSA) applicable policies for probationary employees. As defined in the Investigative Summary (IF, pp. 16-17, Exhibit 9, pp. 1-3 and Exhibit 10, pp. 1-4), the SSA policies say in part that, "... probationary employees will be entitled to ongoing counseling about the employee's job performance and conduct ... and their standing through completion of their probationary period and will be given two (2) weeks notice before termination...."

Further, Article 33, Section 3 of the 2005 AFGE & SSA contract provision on removal process for non-probationary (career) and probationary in the AFGE bargaining unit says that, "... the Administration agrees to provide probationary employees with the opportunity to develop and to demonstrate their proficiency ... and they may be separated from service for cause ...." (IF: Exhibit 9, pp. 2-3, Exhibit 10, pp. 3-4). Here, you can figure it out yourself, Mr. Kleinman, that if the management's allegations were true, I, as a probationary employee, should have been entitled to ongoing counseling by my two immediate supervisors - Jenita Ford and Eric Jimenez, or, in their absence, by the HOD Emily Montuya. But, evidently, no counseling of any kind occurred during my employment at SF-ODAR. For one thing, Emily Montuya's charges of "insubordination, not following orders from supervisors, argumentative or aggressive to supervisors..." were not even mentioned in the sworn testimonies of the two supervisors – Jenita Ford and Eric Jimenez (IF: Affidavits B and C). If the charges were true, the two supervisors could have been the first ones to have counseled me and have documented the issues and would also be the first ones to have reported the issues in their sworn testimonies (IF: Affidavits B, C, D). It is true that their testimonies include the job performance issues which I have already rebutted with evidence (IF: Exhibit A-1, pp.1-7, Exhibit 2, pp. 1-10). Apparently, no one at the SF-ODAR workplace has viewed me like how Emily Montuya falsely charged me. For this

Page 3/87(C. Pascual's 05/13/08 Letter to C. Kleinman's)

reason, I strongly suspect that Emily Montuya's issues were made up issues by Emily Montuya herself, inasmuch as she could not produce any evidence or documentations to this effect, such as, write up, notes, or record of the dates she counseled me, if any, with my signature on the documents.

As discussed in my 11/19/07 rebuttal (IF: Exhibit A-1, pp. 1-7), Emily Montuya did not follow the Agency's internal procedures as she did not provide me any counseling about her charges that could have alerted me that my job performance and conduct at work were not acceptable. This deviation from the Agency's (IF: Investigative Summary, p. 17) normal procedures signals Emily Montuya's pretextual explanation for my discharge. It was not until after her decision to terminate my employment on 03/30/07 before my one-year probationary period was supposed to have ended on 04/23/07, when she decided to put my job performance and conduct at issue (IF: Exhibit A-1, pp. 1-7).

Obviously, the SF-ODAR management violated the SSA policy applicable for probationary employees. They did not give me a chance to demonstrate further my proficiency in performing my job. I was fired on March 30, 2007, the same day I was asked to sign a termination letter the same day I was fired on March 30, 2007. Sadly and unexpectedly, I was given only less than five (5) minutes to pick up my purse and jacket, then called the security guard to escort me out, as if I have committed a crime (IF: Affidavit A, Exhibits A-1 and 2).

(3)  C. Kleinman's Analysis of the Case Issues (re Agency's 04/14/08 decision letter).

On page 7, 5th paragraph of your "Analysis" of the case, as indicated in the Agency's decision letter dated 04/14/08 signed by the Acting Associate Commissioner, Ms. Tina Waddell, you stated that my supervisor's (Jenita Ford) evaluation of my job performance covered only the first sixty (60) days of my employment. False. The truth is, the supervisor's evaluation covered the first six (6) months of my one-year probationary period (April/2006 to September/2006) and the supervisor and I signed the job evaluation document on October 30, 2006 (IF: Exhibit 6-Job Evaluation). Also, you indicated that I was terminated at the end of my probationary period. False. The end of my one-year probationary period was supposed to be on April 24, 2007, but Emily Montuya abruptly terminated my employment on March 30, 2007. Further, it is true that my training with my mentor, Ron Miecznikowski, took place for only two months (10/2006 to 11/2006), however, after my training, my mentor was also following up how I've been doing in my job and, therefore, he was fully aware of my becoming proficient in my assigned tasks till the HOD Emily Montuya abruptly terminated my employment on 03/30/07. For your information, Mr. Kleinman, I was not accommodated with requests to change mentors or supervisors several times. Only one trainer, Ron Miecznikowski. And there were only two supervisors at the ODAR

Page 4/87(C. Pascual's 05/13/08 Letter to C. Kleinman's)

workplace and, therefore, it couldn't be that I was transferred several times from one supervisor to another. Only two times and the reasons for the transfers: on the first, I joined my trainer, Ron Miecznikowski, who was in Eric Jimenez's group B, and on the second, problems popped up with Eric Jimenez's harassing and discriminating me against (IF: Affidavit A) so, in order to avoid him, I requested to be transferred back to Jenita Ford's group A. Also, no verbal or oral counseling from the supervisors nor from the HOD Emily Montuya (only occasional remarks, e.g., if I have already done the filing, photocopying, mailing, purging or shredding, etc.). Further, although I had a number of witnesses who were willing to vouch for my job performance, most of them were already intimidated by the SF-ODAR management, especially by Emily Montuya and Eric Jimenez (IF: Affidavit A, Exhibit A-1). Additionally, supervisor Eric Jimenez obviously influenced the HOD Emily Montuya in her decision to terminate my employment on 03/30/07, for the reasons that he did not submit my Job Performance Appraisal to Emily Montuya and also the fact that Emily Montuya did not share with me what transpired in her conversation with Eric Jimenez regarding my job performance (IF: Affidavit A and Exhibit A-1). As a result, the HOD Emily Montuya just merely applied her guesswork, hearsay, and unfounded allegations to abruptly terminate my employment on March 30, 2007.

(4)    In your 04/22/08 letter, you emphasized the management's issues against me, just as you perceived and believed in them as correct, even without proving with evidence if their allegations were true or not.    In this case, it appears that you are letting the management team members get away with their false charges against me. Moreover, while it is true that supervisor Eric Jimenez was the only one who harassed and discriminated me against, face to face, based on my age and national origin (IF: Affidavit A, Exhibit A-1, pp.1-7, and Exhibit 2, pp. 1-10), at the same time, all four of the management team members have submitted false issues against me.    For example, Chief Judge Benjamin Parks, who was not my supervisor or trainer, created false issues regarding my job performance (IF: Exhibit A-1) and used them as pretext to his team member HOD Emily Montuya's untruthful issues to terminate my employment on 03/30/07 (IF: Affidavit D).    The two supervisors, Jenita Ford and Eric Jimenez also submitted false issues about my job performance (IF: Affidavits B & C) which, of course, I have already rebutted with evidence (IF: Exhibit A-1).

(5)    Ironically, Mr.Kleinman, it appears that you have applied a "short-cut" way in your case analysis as you have acted like an "advocate" for the SF-ODAR management in support of their issues.    You have relied heavily on their false charges to the extent that you have neglected to review the sworn testimonies of my two immediate supervisors, Jenita Ford's and Eric Jimenez's (IF: Affidavits B and C).    If Emily Montuya's allegations were true, she would have definitely documented the issues while I was still employed at ODAR's.    Emily Montuya was not my supervisor,

Page 5/87(C. Pascual's 05/13/08 Letter to C. Kleinman's)

I was reporting directly for work to supervisor Eric Jimenez during the long leave of absence of my supervisor Jenita Ford  (IF: Exhibit A-1) and, therefore, Eric Jimenez must be quite aware of the quality and quantity of the work I was doing for ODAR.  But because of Eric Jimenez's harassing and discriminating me against  (IF: Exhibit A-1), he did not have the courage to tell the truth that effective 12/2006, after my training ended in 11/2006,  I was already demonstrating my proficiency in processing cases for the SF-ODAR judges and also in my other assigned computer jobs.

(6)      Due to the complexities of my discrimination case, I stated in my report (IF: Exhibit A-1) that I find it was not easy to prove my age and national origin discrimination issues because the harasser, supervisor Eric Jimenez, did his harassing and discriminating me in his own very subtle ways.    That is, whenever he was up to do his intentions,  he made sure that no one was around  in my cubicle (to witness) but me – the victim,  therefore,  none of my witnesses could confirm these issues (IF: Affidavit A).    Then you also argued  in your case analysis that  supervisor Eric Jimenez's unjustified comments that,  "... my age and weakness... affected my ability to process work  and that ... the cases I was processing were not worth the pay I was receiving from the Agency ..."   were not addressed to Eric Jimenez during the investigation.    The contract investigator,  who was supposed to be concerned in collecting and evaluating data for investigation,  was  in full control to determine which documentations or interviews  were necessary to include in his Investigative File (IF).    However, Mr. Kleinman, if you thoroughly read  the issues discussed in the Investigative File, you should have noticed the investigator's 11/14/07 e-mail on the 7th paragraph that says, "... supervisor Eric Jimenez declared he never made any unjustified or unnecessary comments about your work...."  This indicates that the investigator already addressed the issues to Eric Jimenez during the investigation of the case, but, as usual, Eric Jimenez denies everything.  As proven in the past, everytime he does an inappropriate act or says something discriminatory, he either intentionally forget it or deny it. Obviously, Eric Jimenez tried again to apply his technique to the contract investigator or the case by denying his discriminatory comments regarding my capacity for work  (IF: Exhibit A-1, pp. 1-7, and Exhibit 2, pp.1-10).

(7)      Page 2, 1st paragraph of your 04/22/08 letter.    Here, it is true that I did not raise the issue concerning the adequacy of  the Investigative File (IF) because I was depending on the contract investigator's discretion  in completing his report of investigation in a rightfully manner.    And it is also true that I requested the Agency's final decision, without a hearing, because of the fact that I could not afford an attorney to represent me.    I requested further in my statements that the Agency's decision should be based on the facts and evidence shown on the Investigative File (IF).    But that thing did not happen, Mr. Kleinman, because of your negligence to check the details of the important issues, as presented in the Investigative File (IF).    You jumped into

Page 6/87(C. Pascual's 05/13/08 Letter to C. Kleinman's)

conclusion that the SF-ODAR management charges are correct, just as you perceived and believed in them even without proving with evidence if the charges were true or not.

(8)    Mr. Kleinman, your negligence is evident because of the fact that my workplace harassment issues at the SF-ODAR workplace were not addressed (under Title VII of the Civil Rights Act of 1964). Apparently, this is in addition to your erroneous and biased processing of the case issues as shown in the 04/14/08 decision letter signed by the Acting Associate Commissioner, Ms. Tina Waddell, and also shown in your 4/22/08 letter. As discussed earlier, supervisor Eric Jimenez relentlessly harassed me, then discriminated me against at the SF-ODAR workplace in his own very subtle ways during my training time in October and November 2006. Each time he did his inappropriate discriminatory actions, he made sure that no one was around in my cubicle (to witness) but me - the victim, as fully discussed in the Investigative File (Exhibit A-1) and also briefly discussed below:

**(1) Eric Jimenez made unjustified comments about the quantity of work I was doing during my training in October and November 2006. He said that, "…the cases I was processing were not worth the pay I was receiving from the Agency…" (IF: Affidavit A and Exhibit A-1). He repeated his unnecessary comments during those days I was still learning my new job. He denied having made those comments in spite of the fact that he repeated the same comments , face to face, to Emily Montuya in our meeting in November 2006, and I also reported the same issue to Judge Benjamin Parks in his office, also in November 2006 but, like Emily Montuya, the Judge did nothing about it (IF: Exhibit A-1 & Exhibit 2).**

**(2) He also made sarcastic remarks about my strong and unusual accent in my speech in my cubicle alone, which he also denied. No one at the workplace has criticized me how I pronounce my words (IF: Exhibits A-1 and 2).**

**(3) He was also sending me numerous irrelevant e-mails that disturbed my work flow because I had to get to the computer to respond (IF: Affidavit A). He also denied this issue (IF: Exhibit A-1).**

**(4) Supervisor Eric Jimenez was persistently stalking me like a "vulture" by either walking around my cubicle several times during office hours to check what I was doing or surprisingly getting into my cubicle anytime he pleases to count the number of cases I have already processed. Some co-workers have noticed these inappropriate acts of supervisor Eric Jimenez (IF: Exhibit s A-1 & 2).**

**(5) He was fond of associating himself with the younger set and frequently did them preferential treatments. There was a time he trained a younger employee, instead of me, on new codes to process cases for the judges (IF: Exhibit A-1). As a fairly new employee then and a trainee, I was looking up to supervisor Eric Jimenez for assistance, but he took it for granted. He denied this issue, but the Hearing Office**

Page 7/87 (C. Pascual's 05/13/08 Letter to C. Kleinman's)

> **Director, Emily Montuya, was very much aware of Eric Jimenez' attitude towards me, but did nothing about it (IF: Exhibits A-1 and 2).**
>
> **(6) He also used his discriminatory supervisory power when he warned me during my training in October 2006 that he will initiate a disciplinary action against me if I will not raise the number of cases I was processing per day (IF: Exhibit A-1).**

Because the supervisor, Eric Jimenez, had already accustomed himself in the past to use his harassment technique to treat me differently on numerous occasions at the SF-ODAR workplace in his very subtle ways, he fearlessly denied all of the above.

## CONCLUSION

Mr. Kleinman, based on the discussion of the facts and evidence, along with other contributing factors relevant to the case, as discussed earlier in this report, it shows that you have ignored or have disregarded which evidence to include and believe in in order to help you decide what you think really happened.  More specifically,  you intentionally did not consider the Agency's (SSA) policies applicable to probationary employees, like in my case, but enforced your own assumed laws that led you to create erroneous and biased determinations to render an unfair decision in my case, as earlier discussed in this report.

Needless to say, since discrimination is also considered as an injury, the SF-ODAR management's false charges have caused me to experience mental anguish (depression) which prevents me to attend to the things I need in order to live with self-respect.   Thank you.

Sincerely,

Corazon S. Pascual
(Complainant)

Enclosures: As stated.

## Performance Evaluation

Your performance, like that of all employees, is continually evaluated by your supervisor. This will help ensure that you are performing at a satisfactory level and that you are assisted in correcting any deficiencies.

You will receive an orientation briefing by your supervisor at the beginning of your performance period. This briefing should explain and clarify your job responsibilities and performance expectations. You will also receive at least one informal discussion during the performance period to assess your progress or to identify and try to resolve any problems you may be having. You may initiate these informal discussions anytime that you want further guidance or understanding of your work performance.

You also will receive a formal evaluation annually. A rating of "Successful" provides basic eligibility to be considered for appropriate awards, promotions and other personnel actions.

## Job Opportunities

**PROMOTIONS** - In order to get ahead, you should:

- Do your present job to the very best of your ability;

- Take advantage of training and self-development opportunities both on and off the job; and

- Keep alert for job opportunities as they arise.

It is SSA policy to promote people on the basis of merit. Your past experience, training and self-development, outside activities and any awards you may receive for superior accomplishments or adopted suggestions will be considered in evaluating your qualifications for promotion.

Exhibit _9_
Page _2_ of _3_

**From:**       Gonzalez, Lynn
**Sent:**       Wednesday, September 26, 2007 9:30 AM
**To:**         'Michael Fleury '
**Cc:**         Higdon, Brenda
**Subject:**    Investigative Document Request- Case #SF 07-0426

**Importance:**     High

Mr. Fleury:   Below is the information you requested regarding Agency policies on the termination of career and career probationary employees.   Questions regarding this information can be directed to Brenda Higdon at 510-970-2856.      Thank-you

Lynn Gonzalez
Center for Human Resources
Social Security Administration
510-970-2852

---

Copy of 2005 AFGE & SSA Contract provision on removal process for non-probationary (career) and probationary in the AFGE bargaining unit.

## Article 23

## Disciplinary and Adverse Actions

**Section 6. Removal, Suspension for More Than 14 Days, Reduction-in-Grade, Reduction-in-Pay, and Furlough of 30 Days or Less**

A. An employee against whom such an action is proposed is entitled to:

1. Advance written notice of thirty (30) calendar days stating the specific reasons for the proposed action;

2. The right to review the material which is relied on to support the reason(s) for the proposed action;

3. Twenty-five (25) calendar days to respond orally and in writing, and to furnish affidavits and other documentary evidence in support of the response; and

4. Be represented.

B. The employee will be given a reasonable amount of duty time to prepare and present a response to the proposal.

C. After receiving the employee's response, the Administration will issue a written decision.   If the decision is to effect an action specified in this section, it will specify

Exhibit _10_
Page _3_ of _4_

the reason therefore, the effective date, the action to be taken, and the decision appeal rights.

The employee may appeal the decision to the Merit Systems Protection Board or, the employee may file a written grievance under the terms of this agreement.   Any such grievance will be initiated at the last (pre-arbitration) step.

The choice of the appeal forum is irrevocable.   An employee shall be deemed to have exercised his/her option at such time as the employee timely initiates an action under the statutory procedures, or timely files a written grievance at the last (pre-arbitration) step, whichever occurs first.   Any grievance must be initiated no later than 20 days after the effective date of the action.

D.  Employees shall be entitled to representation in all phases of these procedures.

## Article 33

## Temporary, Probationary, Part-Time Permanent and Seasonal Employees

### Section 3. Probationary Employees

A.  The Administration agrees to provide probationary employees with the opportunity to develop and to demonstrate their proficiency.

B.  During the probationary period, the employees' conduct and performance in the actual duties of their positions may be observed, their preemployment background investigated, and **they may be separated from the service for cause. (emphasis added)**

C.  Probationary employees will be entitled to ongoing counseling about their conduct and performance and their standing through completion of their probationary period.

D.  Probationary employees have the right to Union representation.

E.  It is management's intent that, when a probationary employee is to be separated, the employee will ordinarily be given two (2) weeks notice of termination, when practicable, or such notice as the remaining probationary period permits.

F.  In cases of impending separation (for cause other than misconduct), the Administration will give consideration to placement of the probationary employee in positions commensurate with his/her demonstrated ability.

Exhibit _10_
Page _4_ of _4_

C. Temporary employees may be separated at anytime upon notice in writing from the Agency. When it is determined that a temporary employee is to be separated, the employee will normally be given two (2) weeks notice.

## Section 3. Probationary Employees

A. The Administration agrees to provide probationary employees with the opportunity to develop and to demonstrate their proficiency.

B. During the probationary period, the employees' conduct and performance in the actual duties of their positions may be observed, their preemployment background investigated, and they may be separated from the service for cause.

C. Probationary employees will be entitled to ongoing counseling about their conduct and performance and their standing through completion of their probationary period.

D. Probationary employees have the right to Union representation.

E. It is management's intent that, when a probationary employee is to be separated, the employee will ordinarily be given two (2) weeks notice of termination, when practicable, or such notice as the remaining probationary period permits.

F. In cases of impending separation (for cause other than misconduct), the Administration will give consideration to placement of the probationary employee in positions commensurate with his/her demonstrated ability.

Exhibit _9_
Page _3_ of _3_

From: corazonspascual@hotmail.com,
To:    "Waddell, Tina" <Tina.Waddell@ssa.gov>
Cc:    Chester.Kleinman@ssa.gov, Arthur.Horton@ssa.gov
Bcc:
Subject: RE: SF-07-426-SSA, DOF: 05-21-07


Dear Ms. Waddell:

Please note  that my main concern is about the false statements your
employee, Mr. Chester Kleinman, a senior attorney and policy advisor for
SSA-OCREO and an EEO employee, has used in his processing the analysis of
the above-referenced case.  As shown in the Agency's  decision letter you
signed on 04/14/08 and in his 04/22/08 letter,  his statements are in
complete contradiction to the evidence and facts shown on the Investigative
File (IF).    I referred to the Agency's (SSA) policies applicable to
probationary employees, as shown on the Investigative File, to refute Mr.
Kleinman's false information.   Of course, no one can go against  the EEOC
policies and regulations you mentioned in your 06/05/08 e-mail, which
apparently  Mr. Kleinman  has used as his defense in his analysis of the case.
The point of the matter here, however, is the fact that  Mr. Kleinman
evidently supplied untrue statements, as part of his  analysis of the case
issues, in order to justify his erroneous and biased determinations to reach
an unfair decision in my case,  as  explained in my rebuttal letter dated
05/13/08 (revised 05/14/08)  I have e-mailed to your office, as attachments.

The same thing happened when the San Francisco Office of Disability and
Adjudication Review (SF-ODAR) management staff  (Chief Judge Benjamin
Parks, Hearing Office Director Emily Montuya, Supervisors Jenita Ford and
Eric Jimenez)  orchestrated an effort to submit false issues against me  to
defend their team member Emily Montuya's  untruthful issues to abruptly
terminate my employment on 03/30/0ợ, as discussed on the Investigative
File and in the  attached reports.    For example, Chief Judge Benjamin Parks
submitted false issues to the investigator, in his sworn testimony, as pretext
to Emily Montuya's  allegations regarding my job performance and conduct,
Jenita Ford contradicted herself  in her sworn testimony to the investigator,
as evidenced in the Investigative File (Exhibit 6-Job Evaluation),  Eric
Jimenez, as usual, fearlessly concealed his harassing and discriminatory
actions against me by also submitting untrue statements to the investigator
regarding my job performance, as discussed with evidence on the
Investigative File and in my revised letter dated 05/14/08.

In search for justice, therefore,  I submitted the above-mentioned case
complaint to your office,  Social Security Administration San Francisco-Office
for Civil Rights and Equal Opportunity (SSA-OCREO),  on May 21, 2007.
Unfortunately, upon receiving and reading  the Agency's decision letter you
signed on 04/14/08, and also Mr. Kleinman's letter dated 04/22/08,   I
immediately noticed Mr. Kleinman's  erroneous and biased determinations he

Page 2/2  (My 06/07/08 E-mail Response to T. Waddell 6/05/08 Email)

used to make a decision in my case.    Ms. Waddell, I did not mean to be discussing with you continuously my dissatisfaction with the Agency's decision, I was just responding to your e-mail dated  06/04/08.    In fact, I agree with you,  Ms. Waddell,  when you mentioned in your 06/05/08  email that my only recourse now is  to either  appeal my case with the EEOC (deadline expired),  or,  to file  a civil action with the U. S. District Court. Needless to say,  because I consider filing a case  with the Court  as a delicate and serious matter, I should  review the evidence of my case along with other contributing factors relevant to the case issues.   My deadline to file expires on July 14, 2008.   Thank you.

Respectfully yours,
(signed)
Corazon S. Pascual


---------------------------------------
> Subject: RE: SF-07-426-SSA, DOF: 05-21-07
> Date: Thu, 5 Jun 2008 09:04:15 -0500
> From: Tina.Waddell@ssa.gov
> To: corazonspascual@hotmail.com
>
>
> Ms. Pasqual:
>
> This is in response to your e-mail below, again voicing your continuing dissatisfaction with the Final Agency Decision issued by Social Security Administration (SSA) in your complaint of discrimination, SF-07-0426-SSA.
>
> We regret your continued dissatisfaction with the decision issued in your case. As I previously wrote you, SSA has issued its final decision.  We have reviewed your concerns raised in this and in previous correspondence, as well as information contained in your file.  We have not found support for your allegations of discrimination. We processed your case in accordance with EEOC regulations found in 29 C.F.R. § 1614 and Management Directive 110.  As far as SSA is concerned, this matter is closed.
>
> As previously stated in prior correspondence, your only recourse, if you disagree with the SSA's decision, is to appeal to the EEOC's Office of Federal Operations or to file a lawsuit in federal court. You had 30 days to file your appeal with EEOC and 90 days in which to file a lawsuit, from the date you

received the Agency's Final Decision.  Our records indicate that you received the Agency's Final Decision via FedEx on April 16, 2008.
>
> Thus, you should direct any issues with the decision to the EEOC or advance your concerns in federal court.  SSA's processing of your case has ended; and we can take no further action.
>
> Tina M. Waddell
> Acting Associate Commissioner
>  for Civil Rights and Equal Opportunity

DISCRIMINATION CASE: sf-07-0426-SSA

When I was a child, I think and speak and lie like a child. But as I grow older, I began to realize and appreciate with mature reasons the value of the truth corresponding to the established fact or reality. I should admit, though, that when sometimes I stumbled, I resorted to "white lie", so to speak, out of politeness and without harmful intent. But more importantly, I humbly should also admit that I have tried the best I could, whenever it was humanly possible, to make amends and reparations to the wrongdoings I have done in the past.

I mentioned the above humble feelings of mine, because I'm having a dilemma on whether or not to accept the fact that I find most of the high-positioned employees with authority and influence could easily create false issues against ordinary employees, like in my case, at their own convenience in order to win favor on their side without being investigated by the authority in-charge.

Honestly, what is happening in my case, as referenced above, is something I could not easily penetrate. In search for justice, I submitted on May 21, 2007 a discrimination and workplace harassment complaint against the SF-ODAR management staff (as discussed on the Investigative File - relevant copies are attached) to the SSA-Office for Civil Rights and Equal Opportunity (SSA-OCREO). The case was investigated by an authorized contract investigator of the Agency (SSA) and his Report of Investigation is shown on the Investigative File (relevant copies are attached). After the investigation, the OCREO employee, Mr. Chester Kleinman, processed the analysis of the case and also wrote the decision letter in behalf of the Agency. Unfortunately, he supplied erroneous information that led him to write a biased decision in my case (as discussed in my attached 05/14/08 letter). I informed Ms. Tina Waddell, the Acting Associate Commissioner who signed the decision letter on 04/14/08, about what Mr. Kleinman did (as discussed on the attached documents). Ms. Waddell did not, however, acknowledge in her correspondence with me via her e-mails dated 06/04-05-06/08 about my complaint regarding Mr. Kleinman's discrepancies in the analysis of the case. The only thing Ms. Waddell e-mailed me about was simply to inform me that my case is closed and there's nothing more the Agency could do. It appears, therefore, that Ms. Waddell did not even care about my complaint of Mr. Kleinman's untrue statements in processing the Agency's decision. Additionally, in my e-mails to another employee of Ms. Waddell, Mr. Arthur Horton, Director of OCREO's Processing Center, I informed him about the discrepancies Mr. Kleinman's erroneous and biased decision in my case. But the same thing, I did not hear from Mr. Horton either about my complaint. In addition to Mr. Kleinman's discrepancies in processing the case analysis and writing the Agency's decision in my case, he also neglected to address the SF-ODAR management's false issues against me (as discussed in the Investigative File and on the attached documents) in his analysis of the case. Mr. Chester Kleinman seemed not to have read the facts and evidence discussed in the Investigative File (IF) because his arguments of the case issues are not what they are as shown in the Report of Investigation. He defiantly argued in his 04/22/08 letter (attached) the SF-ODAR management's issues against me, making me look like I was at fault. The SF-ODAR management could not produce any evidence of

- 2 -

their issues against me to the investigator of the case.   Mr. Kleinman, in his arguments of the issues, undoubtedly disregarded the important issues of  my case, like, workplace harassment, as part of my discrimination complaint (under Title VII of the Civil Rights Act of 1964).   He concentrated on emphasizing the management's false issues against me as a camouflage for his negligence to write a fair decision in behalf of the Agency (SSA).

Mr. Kleinman, as I mentioned in my 05/14/08 letter-rebuttal, acted like an "advocate"  in support of the management's false issues (as discussed on the Investigative File and on the attached report).   Mr. Chester Kleinman might be forgetting the real purpose or mission of the Social Security Administration-Office for Civil Rights and Equal Opportunity, which he is representing.   Thank you.



# SOCIAL SECURITY

## APR 1 4 2008

VIA FEDERAL EXPRESS

Ms. Corazon S. Pascual
3143 Fillmore Street, Apt. 301
San Francisco, CA 94123-3451

Dear Ms. Pascual:

RE:  SF-07-0426-SSA
        DOF: 05-21-07

This is the Social Security Administration's (SSA's) final decision on your (hereinafter, Complainant) complaint of discrimination.

Complainant alleged that based on her age (67), race and national origin (Filipino), she was subjected to harassment and a hostile work environment, which culminated in her employment being terminated during her probationary period, effective March 30, 2007.

This complaint is brought pursuant to Title VII of the Civil Rights Act ("Title VII") of 1964, as amended, and the Age Discrimination in Employment Act (ADEA) of 1967, as amended.

The evidence in the record has been reviewed and fully considered. As explained below, we find that management has articulated legitimate, nondiscriminatory reasons for its action.

## BACKGROUND

Complainant requested EEO counseling on April 2, 2007, 2006 (Exhibit 2). The EEO Counselor's efforts to informally resolve the allegations were unsuccessful. On May 8, 2007, the EEO Counselor issued Complainant the Final Interview and Notice of Right to File a Formal Complaint of Discrimination (Exhibit 2, page 20). Complainant filed this formal complaint on May 21, 2007 (postmark) (Exhibit 1, page 1). On June 18, 2007, we accepted the complaint for investigation pursuant to Title 29 Code of Federal Regulations (29 C.F.R.), Part 1614. An investigation was conducted from September 19 through December 16, 2007. On January 10, 2008, we sent

2

Complainant the Report of Investigation (ROI), which included the investigative summary (IS). The notice of rights we sent with the ROI explained that Complainant could request a hearing or a final decision without a hearing. On January 23, 2008, we received Complainant's request for a final agency decision. Therefore, in accordance with 29 C.F.R. 1614.110(b), we are issuing the final decision based on the merits of the complaint.

On April 24, 2006, Complainant was hired as a GS-986-6 Legal Assistant (Case Technician) in the Office of Disability and Adjudication Review, San Francisco, California (Exhibit 5). In order to be converted to a career appointment, Complainant was required to fulfill a 1-year probationary period. Emilia Montuya (Filipino-American, age 58), Hearing Office Director (HOD), hired Complainant and also terminated Complainant's employment (Exhibit D and Exhibit 5). Complainant believes the HOD's decision was influenced by Group Supervisor Eric Jimenez (White, Latino, age 44). During her tenure, Complainant was alternately supervised by Mr. Jimenez and Group Supervisor Jenita Ford (African-American, age 36). Mr. Benjamin Parks (African-American, age 57) was the Hearing Office Chief Administrative Law Judge (HOCALJ).

Complainant states that she did not anticipate the termination action, and other than occasional remarks about her work, she had not been counseled about her performance prior to receiving the termination letter. Complainant states that the HOD terminated her employment in a discriminatory manner by making unfounded allegations that her poor performance and unprofessional conduct were the bases of her termination. Further, that the HOD has no evidence or witnesses to back up her charges but has chosen to rely on inaccurate assumptions and hearsay in issuing the termination letter. Complainant states that she was the only probationary employee at the time and she has no comparators (Exhibit A).

Complainant believes Mr. Jimenez considered her age, race and national origin, when he influenced the HOD because within the first few weeks of his arrival in the office in October 2006, he would come into her cubicle to ask her about her work, i.e., the reason she was not getting more work done for the pay she was receiving; he monitored Complainant and continually pushed her to work faster. Complainant contends that Mr. Jimenez made comments such as "move fast…or you can't …due to your age" or she was weak, which he suggested contributed to her lack of production. She alleges that Mr. Jimenez asked her to repeat herself because her "words were not clear because of her accent (Exhibit 2, page 4). She also alleges that Mr. Jimenez ridiculed her accent. Complainant states that Mr. Jimenez also made comments about her physical and mental abilities. Complainant states that Mr. Jimenez discriminated against her based on her national origin, which resulted in a hostile work environment that affected her performance. Complainant states that Mr. Jimenez was openly hostile to her and discriminated against her regarding workplace issues (Exhibit A1, page 2).

Complainant contends that the HOCALJ discriminated against her because he allegedly provided false statements about her performance in an effort to support the HOD's decision to terminate her employment (Exhibit A, page 3).

Ms. Ford states she supervised Complainant, intermittently, during her probationary period and she was aware that Complainant is Filipino, but she was not aware of her age. She further states that Complainant's protected bases were not considered in any of her decisions regarding Complainant's employment.

Ms. Ford states that during Complainant's probationary period, she discussed performance issues with her. She states they tried providing different trainers to assist her in learning the job requirements; however, those efforts did not result in successful performance. She further states she had concerns with Complainant's inability to interact professionally with coworkers and counseled her in that area as well as provided unofficial counseling on ways to improve her relationships with coworkers (Exhibit B). Ms. Ford provided feedback to the HOD regarding Complainant's performance. Ms. Ford was not aware of other probationary employees who were terminated during their probationary period during her tenure in the office.

Mr. Jimenez has been assigned to the San Francisco ODAR since October 2006 and supervised Complainant, intermittently, during her probationary period. Mr. Jimenez states he was aware that Complainant is Filipino; however, he was not aware of her age until after she was issued a notice of termination. He states that her protected bases were not factors in any decisions he made regarding Complainant (Exhibit C).

Mr. Jimenez contends that he provided Complainant performance counseling and feedback on several occasions that took the form of discussions and e-mails. He states that he provided information and documentation to the Labor Relations staff for their review of the termination decision; however, he had no input into the decision beyond providing performance information.

Mr. Jimenez further contends he did not make any unjustified or unnecessary comments to Complainant about her work performance. He states he discussed Complainant's work performance with her just as he does with all employees under his supervision. Mr. Jimenez states he did not perceive Complainant as an older worker; and, that he has worked with employees of all age groups. He further states the only comparisons he made with Complainant were comparisons about her performance vis-à-vis other employees, performing the same tasks. Mr. Jimenez denies that he made comments about Complainant's accent or manner of speaking. He states that he has an accent and would not consider making an issue of someone's accent. Mr. Jimenez further contends he did not influence the HOD's decision to terminate Complainant. He states he provided facts and performance data, and that was the extent of his interaction with the HOD regarding Complainant's performance. Mr. Jimenez states that he is not aware of other probationary employees who were terminated since he arrived in ODAR (Exhibit C, pp. 2-3).

Ms. Montuya stated that she is aware that Complainant is Filipino-American, but she did not know her age during the time she (Montuya) was employed at the San Francisco ODAR. She further contends Complainant's age and national origin were not factors in the decisions she made when she hired Complainant and subsequently terminated her employment. Ms. Montuya states she signed the letter, advising Complainant of her termination, and did so based, in part, on performance feedback she received from Complainant's supervisors, Eric Jimenez and Jenita Ford. She states her decision was based solely on Complainant's performance and conduct as a probationary employee. She avers she has not terminated other employees during their probationary periods, and her termination decision with regard to Complainant was based on the unsatisfactory performance of Complainant's work assignments and her inability to get along with management and coworkers (Exhibit D).

4

Ms. Montuya states she observed Complainant's conduct during her probationary period. She explains that Complainant did not like the way coworkers assisted her and would complain about it. Complainant would also gossip about coworkers and was very aggressive with her supervisors. Ms. Montuya states that Complainant would not follow instructions, even though she (Montuya) told Complainant several times that she had to follow the instructions that were given to her. Ms. Montuya states that, on several occasions when she tried to explain something to Complainant, she (Montuya) had to tell her to listen and not interrupt, and that Complainant would be given an opportunity to speak after Ms. Montuya finished. Ms. Montuya further states Complainant liked to do jobs she preferred and did not like to perform tasks that were assigned to her, which were not of her liking (Exhibit D, pp. 1-2).

Judge Parks has held the position of HOCALJ since October 2003 and he states that the San Francisco ODAR is a diverse group which includes employees of European, African and Asian heritage, ranging in ages 30 years to over 70 years. He states he first learned of Complainant's age after she was terminated and learned of her national origin after she was hired in April 2006 (Exhibit E).

Judge Parks states that after Complainant had been trained by several individuals in the office, she was still unable to effectively perform all the tasks required of her. Judge Parks explains that Complainant did not demonstrate the required level of multi-tasking that is required for the Case Technician position and did not demonstrate the ability to retain all of the computer system information presented to her. He states he observed Complainant being re-trained by more than one employee several times during her probationary period. However, she failed to successfully master all the work-related duties of her position by the time of her termination. Judge Parks further states Complainant was limited to a restricted group of work-related duties that she could marginally perform after almost a year in her position; and, that Complainant did not demonstrate the ability to learn all the duties required of a Case Technician in a timely manner during her probationary period. Id.

Judge Parks states that from August to November 2006, he had several conversations with Complainant regarding her lack of interpersonal skills and the impact on her overall work performance. Complainant initiated a discussion with Judge Parks to inform him that she was unable to follow the organizational chain of command that required that she discuss work-related performance issues with her Group Supervisor first, then with the HOD and last with him. Judge Parks states that Complainant insisted that she be able to contact the HOD directly when she disapproved of work assignments she received from the Group Supervisor. Judge Parks states Complainant requested a new Group Supervisor; and, the HOD accommodated her request for new group supervisors several times. Nonetheless, Complainant could not take constructive criticism from any supervisor to which she was assigned. Id.

Judge Parks further explains that Complainant could not master the computer-based recording system used to record disability hearings on a CD, i.e., she could not master the series of passwords and other identifying information needed to access the system. He states that on one occasion, she locked up the system during one of his hearings and he had to delay the hearing while he contacted the systems people to unlock the system. Judge Parks mentions that one ALJ specifically requested that Complainant not record his hearings (Exhibit E, page 3). When Complainant was offered

additional training on the system by the contractor, Complainant was argumentative which he believes interfered with her ability to learn the sequential process of keystrokes to operate the system. Judge Parks states that the contractor monitored her use of the system equipment during the hearings because they lacked confidence in her ability to accurately record information. Judge Parks states that Complainant received ample training, including one-on-one training, to improve her ability to succeed at her job. He denies Complainant was discriminated against, as alleged (Exhibit E, pp. 2-4).

In response to the HOCALJ's statement that an ALJ did not want Complainant to monitor his hearings, Complainant states that ALJ Lewald did not want her to monitor his hearing because she was "coughing" too much and that a hearing she previously monitored in November 2006 was done so without complaint (Exhibit 2, page 7).

Ron Miecznikowski (Polish-American, age 61), Senior Case Technician, mentored Complainant during the first 6 months of her probationary period. During the first few weeks of training, he observed that Complainant made relatively slow progress; however, once she became accustomed to his approach and directions, she made good progress. He states he has trained many employees in his tenure with the Agency and would say that she was probably above average (Exhibit F).

Mr. Miecznikowski states he has no reason to believe Complainant's national origin and age were factors in her termination. He recalls an incident when the HOD corrected Complainant in the presence of her peers and opines that the HOD's action was "unprofessional." Mr. Miecznikowski opines that Complainant's employment was terminated because Complainant was independent and did not fit the mold in any of the office cliques; and she did not engage in normal office camaraderie and teamwork. Id.


## LEGAL FRAMEWORK

### Disparate Treatment

Discrimination based on race, sex, national origin or reprisal is prohibited by Title VII of the Civil Rights Act of 1964, as amended. Discrimination against federal employees forty years of age and over is prohibited by the ADEA. The systematic approach used in analyzing discrimination cases requires that Complainant first establish a *prima facie* case. If Complainant is successful, a presumption arises that there was discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Furnco Construction Corporation v. Waters, 438 U.S. 567 (1978).

Management must then articulate legitimate, nondiscriminatory reasons for its action, which if believed, would support a finding that they were not motivated by unlawful discrimination. Burdine, 450 U.S. at 254-255 and n.8. At this point, the McDonnell Douglas framework becomes irrelevant and Complainant must prove, by a preponderance of the evidence, that the Agency intentionally discriminated against her based on her protected status. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). The same analytical framework developed under Title VII is also

generally applied to age discrimination cases. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996). However, the standard of proof for disparate treatment based on age is more rigorous than the standard of proof for disparate treatment under Title VII. In cases involving age discrimination, a complainant must show that his or her age was the determining factor in the agency's action rather than a factor that played a part in the decision. Velotta v. Department of Justice, EEOC Appeal No. 01981921 (Aug. 21, 2000).

In those cases where there has been an investigation and the agency articulates a legitimate, nondiscriminatory reason for its employment decision, the establishment of a *prima facie* case becomes irrelevant because there is enough evidence to make a decision based on the merits of the case. Austin v. Department of the Navy, EEOC Appeal No. 0190068 (1990), citing, U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983). Moreover, the analytical framework in McDonnell Douglas "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Furnco, 438 U.S. at 577. Thus, whether a complainant has established a *prima facie* case, where management has provided a legitimate, nondiscriminatory explanation for its action, the factual inquiry must proceed to a decision on the ultimate factual issue in the case, i.e., whether management's actions were discriminatory within the meaning of Title VII. Therefore, there will be no *prima facie* analysis of Complainant's claims of discrimination based on her age and national origin.

The factual circumstances of the case and the bases of discrimination alleged determine the elements of a *prima facie* case of discrimination. McDonnell Douglas, 411 U.S. at 802 n.13. Here, Complainant has alleged that based on her age, national origin and race, her employment was terminated.

Hostile Work Environment Claim

Harassment is actionable only if the incidents to which Complainant has been subjected were "sufficiently severe or pervasive to alter the conditions of [Complainant's] employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998); Cobb v. Department of the Treasury, EEOC Request No. 05970077 (March 13, 1997). To establish a prima facie case of harassment, complainant must show that: (1) she is a member of a statutorily protected class and/or was engaged in prior EEO activity; (2) she was subjected to unwelcome verbal or physical conduct related to her membership in that class and/or her prior EEO activity; (3) the harassment complained of was based on her membership in that class and/or her prior EEO activity; (4) the harassment had the purpose or effect of unreasonably interfering with her work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. See Roberts v. Department of Transportation, EEOC Appeal No, 01970727 (September 15, 2000) (citing Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982).

The conduct in question should be evaluated from the standpoint of a reasonable person, taking into account the particular context in which it occurred. Highlander v. K.F.C. National Management Co., 805 F.2d 804, 42 FEP Cases 654 (6th Cir. 1986). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment -- an environment that a reasonable

enough to create an objectively hostile or abusive environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview. Harris, p. 228. Furthermore, if the complainant does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of employment, and there is no Title VII violation. Harris, pp. 227, 228.

## ANALYSIS

Complainant meets the first two elements of her *prima* facie case in that she is a member of protected classes (Filipino and age 67) and she was subjected to an adverse employment decision (termination). However, Complainant has not proven a nexus between her race, national origin and age and the termination of her employment. Complainant premises her national origin claim on Group Supervisor Jimenez's alleged hostile treatment of her relating to workplace issues and alleges that the manager ridiculed her accent. She believes Mr. Jimenez influenced the HOD's decision to terminate her employment. Although the reasoning appears to be a non sequitur, Complainant may have intended to state that the HOD was influenced by Mr. Jimenez because the HOD, who is also Filipino, would not have been predisposed to terminate Complainant's employment.

The evidence does not support this contention. None of the witnesses confirm that Complainant was mistreated because of her race or national origin. The record indicates that five employees (excluding Complainant) in the office were Filipinos, including the HOD who hired Complainant and then terminated Complainant's employment (Exhibit 7, page 1).

Complainant premises her age claim on a statement she alleges Mr. Jimenez made about her work productivity, i.e., whether she was weak or that age contributed to her inability to process her work assignments quickly. The comment was not addressed with Mr. Jimenez during the investigation of her claim, and she did not identify corroborating witnesses. Complainant also contends that age was a factor in her termination because Mr. Jimenez influenced the HOD's decision to terminate her because of her age. The record indicates that 13 out of 17 of the employees were age 40 or older, including 8 who were age 50 or older and 6 who were older than Complainant (Exhibit 7, page 1).

The courts hold that when the person who makes the decision to fire is the same person who makes the decision to hire (as in this case), it is difficult to impute to [her] an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring. Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997); Carlton v. Mystic Transportation Inc., 202 F.3d 129, 137 (2d Cir. 2000).

Although the reasons given for Complainant's termination are based on her unsatisfactory performance, conduct issues and failure to show improvement, the ROI contains evidence that indicates Complainant was performing at the satisfactory level. To harmonize this inconsistency, we note that the Performance Assessment made by Ms. Ford on October 30, 2006, rated Complainant during her first 60 days of employment (Exhibit 6, page 1) and during the same period that Mr. Miecznikowski was training her and felt she was progressing satisfactorily (Exhibit F, page 1). However, the record indicates Complainant was terminated at the end of her probationary period based on performance exhibited during that period. Therefore, Mr. Miecznikowski can only attest to her progress during the period he mentored Complainant.

8

Complainant offers no additional evidence to refute management's articulated reasons for her termination, other than to disagree with their statements (Exhibit A1, pp. 2-7).

Assuming, *arguendo*, that Complainant could establish a *prima facie* case of discrimination, based on her age, race and national origin, we find that management's reasons for its action are persuasive. Complainant performed poorly in her position and did not improve after progressing through her probationary period. She was accommodated with requests to change mentors and supervisors several times. She was provided repeated verbal counseling and training on work issues. However, there is no evidence that disputes management's reasons for Complainant's termination. In light of sworn testimony by several management officials relative to Complainant's conduct and performance that are the proffered reasons for her termination, we find that management's reasons for its action in this case are not a pretext to hide unlawful discrimination.

Based on a review of the evidence in its entirety, we find that the preponderance of the evidence does not support Complainant's claim of unlawful discrimination.

## DECISION

Accordingly, we find that Complainant was not discriminated against as alleged. The enclosed notice explains Complainant's right to appeal our decision to the Equal Employment Opportunity Commission (EEOC). Complainant should use the enclosed EEOC Form 573, Notice of Appeal/Petition, if she elects to file an appeal with the EEOC.

Sincerely,

Tina Waddell
Acting Associate Commissioner
for Civil Rights and Equal Opportunity

Enclosures:
EEOC Form 573
Notice of Rights

cc:
Claire Green
Elena Stonebraker

Ms. Corazon S. Pascual
3143 Fillmore Street, Apt. 301
San Francisco, CA 94123-3451

Re: SF-07-0426-SSA

Dear Ms. Pascual:

Thank you for your e-mails of April 17, 18, 19 and 21, 2008 to Ms. Tina Waddell, Acting
Associate Commissioner for Civil Rights and Equal Opportunity. Since your correspondence
involves the processing of your EEO complaint, Ms. Waddell asked me to respond to your
concerns.

Accordingly, I have looked into the matters you raised. Although I find that the contract
investigator could have been more thorough in obtaining the information you refer to in your
correspondence, I do not believe that information is material in establishing whether you were
discriminated against by Agency management officials.

While we fully understand that the parties to a complaint of employment discrimination often
have very firm views that the available evidence supports their respective positions, our final
determinations must comport with our interpretations of the relevant evidence and the laws we
enforce.

I would like to remind you that you were a probationary employee and as such had very limited
rights and could be terminated without undue formality. The record does contain testimony
from your direct supervisors of your insubordination and failure to follow orders. The testimony
also indicates that your managers viewed you as an aggressive and argumentative employee.
During the probationary stage - supervisors can terminate the probationer's employment for
any reason. The probationary period provides protection only for the Agency against the
retention of any person who, in spite of having passed preliminary tests, is found by her
supervisors to be lacking in fitness, and capacity to acquire fitness, for Government Service.

Although you allege national origin and age as the bases for your discrimination, the record
shows that Emilia Montuya (Filipino-American, age 58), Hearing Office Director (HOD), is the
same person who hired you and also terminated your employment. Ms. Montuya is of the same
national origin as you and is in the protected age group. The record also shows that Ms.
Montuya's decision to terminate your employment during the probationary period was based on
her personal observation of your conduct and work performance. She explains that you did not
like the way coworkers assisted you and then you would complain about it. Ms. Montuya states
that you would not follow instructions. Ms. Montuya also states that, on several occasions when
she tried to explain something to you, she had to tell you to listen and not interrupt, and that you
would be given an opportunity to speak after Ms. Montuya finished. Ms. Montuya further states
you liked only to do jobs you preferred and did not like to perform tasks that were assigned to

you, which were not to your liking. Ms. Montuya has established non-discriminatory reasons for your termination of employment during the probationary period.

In regard to your dissatisfaction with the Report of Investigation, which we issued to you on January 10, 2008, we sent you a Notice of Rights, which explained your right to request a hearing before the EEOC. At that time you neither requested a hearing nor raised any issues concerning the adequacy of the Report of Investigation. Instead you requested, the Agency issue a Final Decision based on the Report of Investigation.

As reflected in the Notice of Rights which accompanied our Final Agency Decision dated April 14, 2008, you have 30 days from the date of receipt of the Decision to appeal to the Equal Employment Opportunity Commission or within 90 days of receipt to file a lawsuit in U.S. District Court. It is important to note that your right to pursue the underlying matters with the EEOC will expire 30 days after receipt of the notice and pursuit of those matters in federal court will expire after 90 days of receipt of the notice. If these rights expire, they cannot be restored by EEOC.

I hope this information is helpful to you.

If you have any questions concerning this matter, feel free to contact me at 410-965-0697.

Sincerely,

Chester J Kleinman
Senior Policy Advisor
Office for Civil Rights and Equal Opportunity

# SOCIAL SECURITY ADMINISTRATION

## REPORT OF INVESTIGATION

**TITLE:**
Corazon S. Pascual
GS-6 Case Technician (Former)

**CASE NUMBER:**
SF-07-0426-SSA

**DATE:**
November 16, 2007

**CONTRACTOR:**
Workforce Initiatives LLP

**COMPLAINANT'S ADDRESS:**
PO Box 471454
San Francisco CA      94147-1454

**INVESTIGATOR:**
Michael D. Fleury
363 Whitefield Drive
Jeffersonville VT 05464-4417

**REPRESENTATIVE'S NAME
AND ADDRESS:**

None

**TYPE OF INVESTIGATION:**
Age, national origin and termination.

**REMEDY REQUESTED:**
As remedy, Complainant seeks to be reinstated to her
position as a Case Technician/Legal Assistant.

### DESCRIPTION OF THE COMPLAINT

**Nature of Action, Decision, or
Condition Giving Rise to Complaint:**      Termination during Probationary Period

**Date of Alleged Discrimination:**      March 30, 2007

**Identity of Responding
Management Officials:**

Benjamin Parks, Hearing Office Chief ALJ
Emily Montuya, Hearing Office Director
Jenita Ford, Group Supervisor
Eric Jimenez, Group Supervisor

REPORT OF INVESTIGATION
Agency Case Number: SF-07-0426-SSA

Corazon S. Pascual

## INVESTIGATIVE SUMMARY

### ISSUE

**Statement of Claim and Issue to be Investigated:** Complainant alleges discrimination based on Age (67) and National Origin (Filipino) when her employment was terminated effective March 30, 2007.

### AFFIDAVIT TESTIMONY (AGE AND NATIONAL ORIGIN ALLEGATIONS):

**Complainant** provided affidavit testimony identifying her age as 67, and her race/national origin as Filipino. **[Affidavit A]**

**Jenita Ford** testified her year of birth is 1971, and identified her national origin as African-American. Ford affirmed her awareness of Complainant's national origin, but stated she was not aware of the Complainant's age. Ford said she believes the Complainant to be Filipino. **[Affidavit B]**

**Eric Jimenez** stated his year of birth is 1963, and identified his national origin as Latino. Jimenez declared he is aware of the Complainant's national origin and age, stating he believes Complainant to be Filipino and that he learned Complainant's age on the day she was issued a notice of termination during probation. **[Affidavit C]**

**Emily Montuya** testified her year of birth is 1949, and identified her national origin as Filipino-American. Montuya affirmed her awareness of Complainant's national origin, stating she believes Complainant to be Filipino-American. Montuya stated stated she was not aware of the Complainant's age at the time of termination, stating she thought the Complainant was 42 because that is what the Complainant told co-workers. **[Affidavit D]**

**Benjamin F. Parks** stated he was aware of the Complainant's national origin when he saw her as a new employee in 2006. Parks testified he was not aware of the Complainant's age until after she was terminated and filed the instant complaint of discrimination. **[Affidavit E]**

### CLAIM: EMPLOYMENT TERMINATED EFFECTIVE MARCH 30, 2007

### AFFIDAVIT TESTIMONY (AGE AND NATIONAL ORIGIN ALLEGATIONS):

**Complainant Corazon S. Pascual** provided affidavit testimony asserting she began working at the Social Security Administration (SSA) on April 23, 2006. Complainant stated there is a one year probationary period for new career employees at the SSA, and she was terminated during her probationary period as a Legal Assistant, GS-06 at the Social Security Administration on March 30, 2007.

Complainant stated she was prepared for any new jobs or assignments at that time, and had asked Emily Montuya the day prior for additional work assignments. Complainant stated she

8

REPORT OF INVESTIGATION
Agency Case Number: SF-07-0426-SSA                    Corazon S. Pascual

was shocked when Montuya told her to sign a letter about her termination in the presence of
Judge Benjamin Parks. Complainant asserted she asked for an opportunity to read the letter
before signing it, and finally signed the letter stating she did not agree with the claims about her
performance which were stated in the letter.

Complainant declared she had never been counseled on performance prior to receiving this
letter of termination, other than occasional comments and remarks about her work.
Complainant asserted Emily Montuya terminated her employment in a discriminatory manner by
making unfounded allegations that her poor performance and unprofessional conduct were the
bases of her termination. Complainant stated Montuya has no evidence or witnesses to back up
her charges, but has chosen merely to rely on inaccurate assumptions and hearsay in issuing
the termination letter when she wrote that March 30, 2007.

Complainant testified during her probationary period she was given a manual about the
probationary period which had some information about performance and conduct requirements.

Complainant stated Emily Montuya is also Filipino and is somewhat younger than she.
Complainant said she believes Hearing Office Director Emily Montuya did not really consider
her race or age in the termination decision; however, believes Montuya was influenced in her
decision by Group B Supervisor Eric Jimenez, whom she described as a White Puerto Rican
American in his thirties.

Complainant Pascual explained Emily Montuya was the person who hired her at the Social
Security Administration and said Montuya was good to her until Jimenez arrived at the office,
and then she started to become more aggressive.

Complainant testified she believes Eric Jimenez considered her age when he influenced
Montuya because within his first few weeks in the office he came to her cubicle and asked
about her work and asked why she had not done more work. Complainant declared Jimenez
said she wasn't doing enough work for the pay she was getting, and said she told Jimenez she
was a trainee and that she was new to the job and wanted to learn properly. Complainant said
Jimenez kept monitoring her and asked her why she couldn't work faster. Complainant averred
Jimenez asked her if it was because she was weak, or if it was because of her age.
Complainant said Jimenez would not listen to her, but would just turn his back and walk away.
Complainant asserted Jimenez told her that Emily Montuya would just do what he told her to do.

Complainant stated she believes Hearing Office Chief Administrative Law Judge (HOCALJ)
Benjamin Parks discriminated against her because he gave false and untrue statements about
her performance.

Complainant stated she believes her national origin was a factor in her termination because
Jimenez was openly hostile to her and discriminated against her on many occasions regarding
workplace issues.

9

REPORT OF INVESTIGATION                          **Corazon S. Pascual**
Agency Case Number: SF-07-0426-SSA

**COMPLAINANT'S REBUTTAL:**

Complainant testified management's responses represent an orchestrated attempt to support the actions of Emily Montuya in her (Montuya's) decision to terminate her.

Complainant reiterated her complaint of discrimination is based on age and national origin, and asserted Eric Jimenez was not truthful in his statements to the investigator. Complainant stated age discrimination is difficult to prove because Eric Jimenez harassed her in very subtle ways, making sure there were no witnesses.

Complainant declared Judge Benjamin Parks was not her supervisor or her trainer and thus cannot provide true testimony about her performance.

Complainant stated Jenita Ford was not around when Jimenez made his discriminatory remarks, and stated Ford has provided contradictory affidavit testimony because Ford initially rated her (Complainant's) performance as successful, and then testified that her performance was not successful. Complainant stated Ford did not witness her performance during the last four months of her probation, and thus cannot truly state she was unsuccessful. Complainant stated Ford was not accurate in stating she (Complainant) did not get along with co-workers.

Complainant testified Eric Jimenez was not truthful with the investigator and stated his testimony is not credible. Complainant said Jimenez never counseled her about performance, but only about gossiping with a younger employee.

Complainant argued Emily Montuya was not truthful, averring that Montuya's allegations about her performance and conduct are false, and that Montuya did not follow the Agency's internal procedures by providing counseling that would have alerted her that her performance and conduct were not acceptable.

Complainant concluded stating the ODAR management team violated the Agency's policy prohibiting discrimination and harassment of any kind, and is now concealing their discriminatory intent. **[Affidavit A]**

**RECORD EVIDENCE:**

By letter to Complainant dated March 30, 2007, Emily Montuya, advised the Complainant of her termination as a career-conditional probationary employee. Complainant acknowledged receipt of this notification on March 30, 2007, stating her disagreement with the reasons stated in the letter. **[Exhibit 5]**

A SSA Form-331 (Performance Assessment for Non-Supervisory Employees) of Complainant dated October 30, 2006, signed by Jenita Ford, signed as acknowledged by Complainant. This

15

REPORT OF INVESTIGATION
Agency Case Number: SF-07-0426-SSA

Corazon S. Pascual

document indicates discussion and acknowledgement of general performance standards, that an initial performance plan was issued and orientation conducted on August 18, 2006. On October 30, 2006, Complainant was rated as Successful for the period from April 23, 2006 through September 30, 2006 by Supervisor Ford. **[Exhibit 6]**

A position description for Complainant's position, Case Assistant, GS-06, demonstrates the major duties and requirements of the subject position. **[Exhibit 8]**

The Complainant provided a copy of information she stated she received relating to the probationary period and performance evaluation. This unidentified document states the probationary period is a trial period of 1 year and indicates the career appointment is not complete until the probationary period is complete. The document stated, during probation, and employee may be removed from the job at any time if work or conduct is not satisfactory. [**Exhibit 9]**

## APPLICABLE POLICIES:

The record evidence includes relevant excerpts from the <u>Collective Bargaining Agreement</u> (CBA) between the Social Security Administration and the American Federation of Government Employees (AFGE), AFL-CIO, <u>Section 1</u>, <u>Management Rights</u>, <u>Article 33</u>, <u>Temporary Probationary, Part-Time Permanent and Seasonal Employees.</u>

<u>Section 1</u> entitled <u>Management Rights</u> states in relevant parts:

    A. Subject to subsection (B) of this section, nothing in this Agreement shall affect the authority of any management official of any agency—

    1. to determine the mission, budget, organization, number of employees and internal security practices of the agency; and

    2. in accordance with applicable laws--
    a. to hire, assign, direct, layoff and retain employees in the agency or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;
    b. to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be

<u>Article 33</u> of the <u>CBA</u> entitled <u>Temporary Probationary, Part-Time Permanent and Seasonal Employees</u> states in relevant parts:

**Section 3. Probationary Employees**

    A. The Administration agrees to provide probationary employees with the opportunity to develop and to demonstrate their proficiency.

16

REPORT OF INVESTIGATION                          **Corazon S. Pascual**
Agency Case Number: SF-07-0426-SSA

B. During the probationary period, the employees' conduct and performance in the actual duties of their positions may be observed, their preemployment background investigated, and they may be separated from the service for cause.

C. Probationary employees will be entitled to ongoing counseling about their conduct and performance and their standing through completion of their probationary period.

D. Probationary employees have the right to Union representation.

E. It is management's intent that, when a probationary employee is to be separated, the employee will ordinarily be given two (2) weeks notice of termination, when practicable, or such notice as the remaining probationary period permits.

F. In cases of impending separation (for cause other than misconduct), the Administration will give consideration to placement of the probationary employee in positions commensurate with his/her demonstrated ability. **[Exhibit 11]**

## COMPARATIVE DATA (AGE AND NATIONAL ORIGIN ALLEGATIONS):

**Complainant** declared she was the only probationary employee at the ODAR at the time, and that most of the other employees had been in the office for many years. Complainant stated she is not aware of any other probationary employees who were treated in the same way or in a different way than she was. Complainant said some employees were younger than her, and she thinks she is older than Ron Miecznikowski, but is not sure. **[Affidavit A]**

**Jenita Ford** stated she is not aware of other probationary employees who were terminated during probation since she arrived at the office. **[Affidavit B]**

**Supervisor Jimenez** stated he is not aware of other probationary employees who were terminated during probation since he arrived at the San Francisco ODAR. **[Affidavit C]**

**Director Montuya** stated she has not terminated other employees during their probationary period, and that her decision in this matter was based upon the unsatisfactory performance of the Complainant in work assignments and her inability to get along with co-workers. **[Affidavit D]**

## COMPENSATORY DAMAGES

## AFFIDAVIT TESTIMONY (Compensatory Damages):

**Complainant** testified she seeks compensatory damages in an amount determined to be fair and reasonable to compensate for the emotional pain and suffering and the unfair and cruel treatment she has been subjected to. Complainant stated she has not sought any medical treatment because she could not afford it, being that she is not employed at this time. **[Affidavit A]**

17

## Performance Assessment for Non-Supervisory Employees

### Part A: Identifying Information

Employee:  Pscual
Last

Corazon
First

MI

SSN: 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

Case Technician/Legal Assistant
Position Title

067266
Position #

GS986/6
Series/Grade

### Part B: Description of Standard

Select Either:

☒ 1.  Generic Performance Standard:

The successful employee will normally perform the critical element of the position description.  Successful performance means managing assigned workloads in a realistic manner which results in completion of work within reasonable timeframes; contributing in a positive way to the accomplishment of organizational objectives; and duly considering priorities in planning and performing assigned duties.  The skills and knowledge of the employee will usually be effectively applied to provide service to the beneficiaries and to maintain the accuracy of the Agency's records.

☐ 2.  Job Specific Performance Standard:

### Part C: Orientation Briefing(s)

### Part D: Informal Performance Discussions

| | Date | Ee's Intls. | Spvr's Intls. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Date Performance Plan Issued and Orientation Briefing Conducted

8/18/06

Supervisor's Signature

Employee's Initials

Subsequent Orientation Briefing(s):

### Part E: Certification of Performance

1.  Period Covered by Assessment: (if less than full assessment year) From 04/23/06  To 09/30/06

☒ 2.  This certifies that the employee's performance is at the Successful Level (Level 3)

☐ 3.  This certifies that the employee's performance is at the Unacceptable Level (Level 1)

☐ 4.  This is the employee's Rating of Record for assessment year     (complete if applicable)

Assessing Official's Signature          /Date          Employee's Signature          Date

10/30/06                                                                        10/30/06

Form SSA-331 (7-95)

Exhibit 6
Page 1 of 1

**Agency Case No.: SF-ᴸ . -0426-SSA**
**Affidavit of Corazon S. Pascual**

My name is Corazon S. Pascual. I am claiming discrimination based on my race, which is Filipino and my age, which is 67 years. I have been advised of my right to representation and waive that right at this time as I cannot afford an attorney. I am not currently employed by the federal government or any other business. I have been actively searching for a job, but because of my employment record and my need to list "terminated" as the reason for leaving my last job, I have not been successful in my job search.

I began working at the Social Security Administration (SSA) on April 23, 2006. There is a one year probationary period for new career employees at the SSA. I was terminated during my probationary period as a Legal Assistant, GS-06 at the Social Security Administration on March 30, 2007. I was prepared for any new jobs or assignments at that time. I had asked Emily Montuya the day prior for additional work assignments and was shocked when she told me to sign a letter about my termination in the presence of Judge Benjamin Parks. I asked for an opportunity to read the letter before signing it, and I finally signed the letter stating I did not agree with the claims about my performance which were stated in the letter. I had never been counseled on my performance prior to receiving this letter of termination other than occasional comments and remarks about my work. Emily Montuya terminated my employment in a discriminatory manner by making unfounded allegations that my poor performance and unprofessional conduct were the bases of my termination. Montuya has no evidence or witnesses to back up her charges, but has chosen merely to rely on inaccurate assumptions and hearsay in issuing the termination letter when she wrote that March 30, 2007.

Affidavit A
Page _1_ of _17_.

Affiant Initials

Agency Case No.: SF-\_ J426-SSA
Affidavit of Corazon S. Pascual

On March 30, 2007, I was only given about three minutes to pack my belongings and leave. Ms. Montuya called the security guard to escort me out of the office.

During my probationary period I was given a manual about the probationary period which had some information about performance and conduct requirements.

Emily Montuya is also Filipino and is somewhat younger than I am. I believe Hearing Office Director Emily Montuya did not really consider my race or age in her termination decision; however, I believe she was influenced in her decision by Group B Supervisor Eric Jimenez, a White Puerto Rican American in his thirties.

Emily Montuya was the person who hired me at the Social Security Administration and she was good to me until Jimenez arrived at the office, and then she started to become more aggressive. She was not like that before Jimenez came to the Office of Adjudication and Review (ODAR).

I believe Eric Jimenez considered my age when he influenced Montuya because within his first few weeks in the office he came to my cubicle and asked me about my work and asked why I had not done more work. Eric Jimenez said I wasn't doing enough work for the pay I was getting, and I told him I was a trainee and that I was new to the job and wanted to learn properly. Jimenez kept monitoring me and asked me why I couldn't work faster. He asked me if it was because I was weak, or if it was because of my age. Jimenez would not listen to me but would just turn his back and walk away. Jimenez told me that Emily Montuya would just do what he told her to do.

Affidavit A
Page _2_ of _17_.
Affiant Initials _____.

Agency Case No.: SF-t. J426-SSA
Affidavit of Corazon S. Pascual

I believe HOCALJ Benjamin Parks discriminated against me because he gave false and untrue statements about my performance.

I believe my race was a factor in my termination because Jimenez was openly hostile to me and discriminated against me on many occasions regarding workplace issues.

I was the only probationary employee at the ODAR at the time. Most of the other employees had been in the office for many years. Therefore, I am not aware of any other probationary employees who were treated in the same way or in a different way than I was. Some employees were younger than me, and I think I am older than Ron Miecznikowski, but I am not sure.

Ron Miecznikowski was my trainer and I would like him to be interviewed regarding my training progress and my conduct. He can be reached at his home phone, 415-665-0886. I would also like HOCALJ Benjamin Parks, Hearing Office Director Montuya, Supervisor Jimenez, and Supervisor Jenita Ford interviewed about my performance and conduct. I would like Bridgett Vaughn interviewed about my performance, and John Heyer interviewed about my conduct as a probationary employee. Several others in the ODAR office have indicated to me that they are not willing to be interviewed as witnesses for various reasons.

I have not filed a grievance on the issue of termination or any other issue because I tried to just deal with it rather than create problems.

As remedy to these issues, I am seeking reinstatement to the Social Security Administration, but at a different office as I no longer feel that I would be welcomed at

Affidavit A
Page 3 of 17.

Affiant Initials

Agency Case No.: SF-⎯. -0426-SSA
Affidavit of Corazon S. Pascual

the ODAR office. I am requesting to be made whole for all lost wages and benefits which

would have accrued to me. I am also requesting compensatory damages in an amount

determined to be fair and reasonable to compensate me for the emotional pain and

suffering and the unfair and cruel treatment I have been subjected to. I have not sought

any medical treatment because I could not afford it because I am not employed at this

time.

---

**Privacy Act Notice**

**Privacy Act Notice.** The collection of this information is authorized by The Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.633a; The Rehabilitation Act of 1973, as amended, 29 U.S.C. 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the Agency is a party or has an interest; to a government agency in order to obtain information relevant to an Agency decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the Agency to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of Agency finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for Investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Agency employees and other witnesses.

---

**Oath / Affirmation**

I have read the foregoing attached statement, consisting of ___4___ pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

I declare, under penalty of perjury, that the foregoing is true and correct.

*(Affiant, sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | Date Signed |
|---|---|
| *Corazon S. Pascual* | *November 1, 2007* |

Affidavit A
Page 4 of 7

Affiant Initials _____

From:        corazon pascual [corazonspascual@hotmail.com]
Sent:        Wednesday, November 14, 2007 8:31 PM
To:          Michael Fleury
Subject:     RE: Agency Case No.: SF-07-0426-SSA

Hello Mr. Fleury,

Thank you for your very important message. I'll prepare my responses and email them to you asap (within five days).

Corazon S. Pascual.

--------------------------------------------------------------------

Date: Wed, 14 Nov 2007 18:16:26 -0500
From: michael_fleury@verizon.net
Subject: Agency Case No.: SF-07-0426-SSA
To: corazonspascual@hotmail.com

Corazon S. Pascual
PO Box 471454
San Francisco CA 94147-1454

Re: Agency Case No.: SF-07-0426-SSA

Dear Ms. Pascual:

I tried calling you today, but did not get an answer.

This will serve as notification to you of the substance of Management's articulated reasons for its actions in your complaint.

### Issue (1): Complainant alleges discrimination based on Age (67) and National Origin (Filipino) when her employment was terminated effective March 30, 2007

**Administrative Law Judge Parks** stated the basis for your termination was poor work performance. Parks stated after being training by several different individuals in the office, you were unable to effectively perform all the tasks required by a Case Technician (CT) within your probationary period. Judge Parks stated you did not demonstrate the required level of multi-tasking required for the CT position nor did you demonstrate the ability to retain all the computer systems information presented. Judge Parks said you did not master successfully all the various work-related duties of your position of CT by the time of your termination. Judge Parks said neither your age nor your national origin was a factor in your termination.

**Supervisor Jenita Ford** testified she did not give any consideration to your National Origin or age in any decisions that she made regarding during your employment.

Ford said during your probationary period, she discussed your performance with you, and shared her

Affidavit A
Page _8_ of _17_.

file://C:\Dad\EEO\Investigations\Pascual_Corazon\RE Agency Case No. SF-07-0426-SS...  11/16/2007

concerns about your performance. Ford stated they tried providing different trainers to assist you in learning the job requirements, as some people learn more readily with a certain style of trainer, however, she said the efforts did not result in successful performance. Ford added they also had concerns with your inability to get along with co-workers and tried to help in that area as well by involving you in unofficial counseling to discuss how to improve your relationships with co-workers.

**Eric Jimenez** stated he did not give any consideration to your National Origin or age in any decisions that he made regarding during your employment. Jimenez said during your probationary period, he provided you performance counseling and feedback on several occasions as required by the Collective Bargaining Agreement. Jimenez declared he never made any unjustified or unnecessary comments to you about your work performance, but stated he discussed the your work performance with you as he does with all employees, and also provided feedback to management about your performance, just as he does with all employees he supervises.

Jimenez declared he did not perceive you as an older worker, and stated he works with employees in all age groups and treats all employees the same. Jimenez said the only comparisons I ever made with you were the comparisons about your performance as compared to other employees doing the same task on both a national and local level. Jimenez stated these comparisons are required as part of the performance feedback provided all employees and is not based upon anything other than task completion, without consideration of things like national origin and/or age of employees.

**Emily Montuya** testified she signed the letter advising you of the termination of your employment and did so based upon the performance feedback she received from your supervisors, Eric Jimenez and Jenita Ford. Montuya said her decision was based solely on your performance and conduct as a probationary employee. Montuya stated she did not give any consideration to your national origin or age when she made the termination decision. Montuya said she was not influenced in her decision by Jimenez or Ford beyond the performance data they provided.
Montuya stated she based her decision in part of conduct issues she observed during your probationary period, and explained the conduct issues included that you did not like the way co-workers helped her and would complain about it, would gossip about co-workers, and were very aggressive with your supervisors. Montuya stated you would not follow instructions, despite the fact that she explained to you several times that you had to follow the instructions you were given. Montuya said your national origin and age were not factors in your termination during probation.

If you wish to submit a rebuttal statement concerning management's given reason(s) for inclusion in my report of investigation; you may do so within five (5) days. Your statement must be received at my office at the address below, by Fax at 610-458-0290, or via email attachment at my email address below, within **five (5) days**. I will close the investigative record at the end of that five (5) day period and will not accept any statement received after that for inclusion in my report of investigation, but will send it to the Agency for its consideration in rendering its final decision in your case.

You will receive a copy of the investigative report from the Agency prior to their making a final decision on your case. You will be afforded an opportunity to comment at that time, and will also be given options for further processing of your case.
Should you have any questions, please feel free to contact me at your convenience.


Michael D. Fleury
Independent EEO Investigator
363 Whitefield Drive
Jeffersonville VT 05464-4417

Phone:  484-459-8813
Fax:    802-760-3017

Affidavit A
Page _9_ of _17_.

FILE NO.: SF-07-0426-SSA

CORAZON S. PASCUAL
(Mail Address:  P. O. Box 471454, San Francisco, CA 94147)
(Home Tel.: 415-409-6679, Email:  corazonspascual@hotmail.com)

November 23, 2007

Michael D. Fleury
Independent EEO Investigator
363 Whitefield Drive
Jeffersonville, VT 05464-4417

Dear Mr. Fleury:

Thank you for giving me an opportunity to respond to the  discriminatory allegations of the SF-ODAR  management team members (Hearing office chief Judge Benjamin Parks, Hearing Office director Emily Montuya, supervisor Eric Jimenez, and supervisor Jenita Ford).    I am not surprised  with the statements they submitted  as they  again demonstrated  an orchestrated effort  in order  to win favor  and  to defend  Emily Montuya's  untruthfulness in her decision to terminate my employment.   What matters here, however,  is not what they said, but the evidence that separates us  -  I have evidence and witnesses,   they have no evidence and witnesses  to support  their  charges.  Thank you.

Sincerely,

Corazon S. Pascual

Attachments.

cc:   OCREO.

p.s., Mr. Fleury,  please note that I am replacing the first rebuttal dated 11/17/2007 with this 11/19/2007 revised one.  I made minor  corrections and  additions.  Thank you.

Exhibit ___A-1___
Page __1__ of __7__ Pages

Corazon S. Pascual                                                              1/6
November 19, 2007 - Rebuttal to SF-ODAR Management's Issues.

I submitted on May 21, 2007 to OCREO a discrimination complaint based on my age
and national origin.   The Agency's (SSA) policy ensures that every employee enjoys a
non-hostile work environment free from discrimination or harassment of any kind,
therefore, I have also included workplace harassment as part of this report.

As I have not previously experienced age discrimination - I do not know it when I saw
it and, therefore, I find that it was not easy to prove it because the harasser, Eric Jimenez
(a SF-ODAR supervisor),   did his harassing and discriminating against me in his own
very subtle ways.  That is, he made sure that no one was around (to witness) but me -
the victim.

The SF-ODAR supervisor, Eric Jimenez,   also discriminated against me based on my
national origin, which resulted in a  hostile working environment that affected my work
performance.   He also did his inappropriate acts in his own ways to make sure that no
one can witness his guilt.

---

Issue (1):  Complainant alleges discrimination based on Age (67) and National Origin
(Filipino).

## MY RESPONSES

Judge Benjamin Parks.

1.      Of course, Judge Parks could say that neither my age nor my national origin was
a factor in my termination  because he was not there when the group B supervisor, Eric
Jimenez, made those age  remarks (i.e., weak…age…less productive) regarding  my
physical and mental capabilities to  perform  my assigned cases (as discussed in my
earlier reports).

2.      Because of Judge Park's narrower perception of the basic facts of the case issues,
he attacked my performance and conduct at work with severe criticisms.  What hurt here
is realizing that  Judge Parks had chosen to create false issues as pretext to Emily
Montuya's untruthfulness in her March 30, 2007 termination letter (as earlier discussed).

3.      The senior case technician Ronald Miecznikowski (and not several individuals,
as the judge alleged) was the only employee who trained me on the various concepts
of processing dismissal cases.   For a short time, the lead Diane Ertman also trained me
but she went on vacation for 45 days or so starting January 2007, so Ron took over.
Jenita Ford instructed the other lead Stacy Bastian to train me, but Stacy did not comply
(please see my 02/26/2007 email to Stacy).

Exhibit  A-1
Page 2 of 7 Pages

*Corazon S. Pascual*
*November 24, 2007*

C. S. Pascual
November 19, 2007 - Rebuttal to Issues.

4.    Although Judge Parks was quite aware that he submitted false issues regarding my escorting and monitoring of his hearings (I have a witness – a contract-monitor to prove it), he still argued in his statements to the investigator that I was not successful or not learning my work-related duties during my probation period.  He also alleged that I was unable to master the computer systems information.    I became proficient in closing dismissal cases starting in December 2006 (right after my training) and the following are proofs that Judge Parks's allegations are false.

(a)    I was able to assist frequently Gregory Mikulan (assistant to Judge Ashmeyer) and Angel Figueros (assistant to Judge Lee) in processing their assigned cases whenever they were overloaded with their judges's stuffs.

(b)    I also assisted other senior case technicians occasionally in their assigned cases whenever time permits.

(c)    I also processed a lot of dismissal cases for Judge Parks whenever his assistant (Lee Levardis) was quite busy.  I never got any major complaint about errors.  I personally delivered my processed cases to Judge Parks for his signature before mailing them to the district office;  he examined the cases and no comment except "thank you."

The above discussion also prove my proficiency in using computer software and programs, otherwise, there could be no way for me to process cases.

5.    Thus, a new employee gradually learns his/her job, if given proper training, then eventually proves his/her abilities in her assigned tasks.  I was in my new job of processing dismissal cases for only four months and Judge Benjamin Parks and the rest of his team members already compared me to those long-time employees at SF- ODAR who were on their jobs for more than ten years.  I'm sure they are aware that there is no clear-cut way to measure one's ability - any particular job could be learned from the beginning.

---

Jenita Ford, Group A supervisor.

1.    Like Judge Parks, Jenita Ford was not also around me when Eric Jimenez made those discriminatory remarks. I certainly do not blame her for saying that age and national origin were not factors in my job termination.    Jenita Ford, however, surprised me about her report of poor job performance and inability to get along with co-workers. I have no idea that she had these allegations. In fact, she contradicted herself in her report to the investigator. She rated my job performance as "successful"

Cleangon X. Pascual
Forember. 24, 2007

C. S. Pascual                                                                    3/6
November 19, 2007 - Rebuttal to Issues.


from April 2006 to October 2006 (please see Jenita Ford's evaluation - a copy is
attached to the documents I submitted to OCREO).


2.      Of course, Jenita and I had minor misunderstanding in the past, but then I
thought we already made up and started being honest and just focus on the job.   I
confidently talked to Jenita about my personal economic problems.  I appreciated her
assisting me search for a better paying job and, with her permission, I made her as
my work and character reference in my job search.  But now it would be without good
sense if I would still keep her as such.


3.      Since Jenita Ford was not almost around during the last four months of my
probation, she did not witness or observe how I became proficient in processing
dismissal cases and performed my other assigned jobs.  I wonder if she was in a
position to evaluate the second half of my probation because for almost the entire
month of December 2006 she was on her Christmas holidays and came back to work in
the middle of January 2007, then took a few more months Leave of Absence (LOA)
starting the early part in February 2007 until my job was terminated on March 30, 2007
and she was not back yet.   In other words, she did not witness the height of my being
proficient in my assigned jobs.


4.      Again, it was only the senior case technician, Ronald Miecznikowski, who
completely trained me in learning my new job on computer.   No other trainers, as
Jenita claimed there were different individuals who trained me.  She assigned another
lead Stacy Bastian, but Stacy did not comply (please see my 02/26/2007 email to Stacy
Bastian).


5.      Jenita Ford's issue about my not getting along with co-workers.  So far, I could
not think of when and over what Jenita Ford said she counseled me on this issue.  The
truth is, it was the friends of Eric Jimenez who caused problems:

        (a)     Erlinda Molar (younger co-worker and friend of Jimenez).  She made me
        look bad in the eyes of Jimenez when she reported that I refused to photocopy
        her stuff - which was not true.  Then Molar apologized.

        (b)     Myrna Beza (one of my witnesses but still on her LOA).  She reported to
        Jenita Ford that I refused to help a claimant - which was wrong.  Beza apologized
        and hugged me.  In fact, she asked me in December 2006 to spend my holidays
        with her family, but I was not able to make it.

Exhibit  A-1
Page  4  of  7  Pages

C. S. Pascual
November 19, 2007 - Rebuttal to Issues.                                          4/6

Eric Jimenez, Group B supervisor.

1.      Out of ignorance or bias, Eric Jimenez disregarded my actual state of physical and
mental ability to perform. He relied upon my age to doubt my capabilities, thereby,
subjected me to treatment that differed substantially from that of younger co-workers's.
Jimenez made verbal insults and perceived me as an old worker – weak, ... less
productive (discussed in my May 3, 2007 Statements, pp. 1 and 2). He denied making
those remarks because he knew I was alone in my cubicle when he made them and,
therefore, no witnesses. Jimenez' denial of his discriminatory acts is no longer credible,
just as how he also denied his inappropriate acts in the past and later admitted them
when trapped with evidence (witnesses) to prove his guilt (discussed in my December 4,
2006 email to Jimenez and in my April 19, 2007 rebuttal to Montuya's termination letter).

2.      Because of Eric Jimenez's false belief that older worker, like me, couldn't be
trained anymore effectively, he had chosen to train a younger employee, Erlinda Molar,
on new codes to process cases. I discussed the issue with Emily Montuya but I was
shocked to hear that she was, in fact, in favor of what Jimenez did (discussed in my
Responses to Management's Statements, p. 1, #3). With Jimenez's discriminatory
motives against me since he got on board in October 2006, he made it a point to become
a strong influence to Emily Montuya and it obviously worked (as observed in the
workplace).

3.      Eric Jimenez also discriminated against me based on my national origin. His
habitual sarcastic comments about my strong unusual accent and the way I say words
resultd in a hostile working environment that affected my work performance. No one at
the workplace has criticized me about how I talk and how I pronounce words. He never
did this inappropriate act to my three other co-workers who have the same origin as
mine.

4.      As usual, Eric Jimenez lied in his statements to the investigator and even
mentioned the Collective Bargaining Agreement (as he bragged at the workplace that he
was a rep in the past. If that was so, he should have applied the basic policies or
principles of the union for the employees's sake). He definitely lied to the investigator
that he counseled me and gave me feedback about my performance. The truth is, the
only thing he did was to pressure me to produce more. When he got on board in
October 2006, as my supervisor then, he asked me to sign a form that concerns the
job expectations new employees should be aware of. At that time, he also used his
discriminatory supervisory power to warn me that he will initiate a disciplinary action if
ever I will not be able to raise the number of cases I processed per day (that time in
October 2006 I was still a trainee). He also bragged about his firing of his employees
from his last job (please see my 12/04/2006 email to Jimenez).

Exhibit     A-1
Page   5  of  7  Pages

C. S. Pascual
November 19, 2007 - Rebuttal to Issues.

5/6

4.    As Eric Jimenez had accustomed himself in the past to conceal his discriminatory acts, he again denied having made unjustified and unnecessary remarks about my job performance.   Very clearly, in October 2006, he surprisingly got into my cubicle and without hesitation, he said that the cases I was processing were not worth the pay I was receiving from the Agency.  He repeated those remarks a few times more whenever he checked my work and he also repeated the same face to face to Emily Montuya in our meeting on November 21, 2006.  I also reported the same to Judge Parks, but like Montuya, he did nothing about it.

5.    Eric Jimenez acted in a most particularly cruel manner when he yelled at me, "...go back to your desk and work...."  That was the time I asked him about working for credit hours.  At first he denied his inappropriate act but later admitted it when trapped with evidence (witnesses) to prove that he actually did it (as discussed in my earlier reports).

6.    Eric Jimenez made persistent observing or stalking within my workplace.  He acted like a "vulture" to spy on me from time to time - either walking around my cubicle to check what I had on my computer or surprisingly get into my cubicle to count the number of cases I already processed.   Not only that, Eric Jimenez's frequent order to see him and his irrelevant emails distracted my work flow as I had to stop to get to the computer to respond (please see my 12/04/2006 email to Jimenez).   He continued his inappropriate acts until he became successful on what he had been wanting to happen to me - that I get fired!

---

Emily Montuya, Hearing Office director.

1.    Emily Montuya also said that age or national origin were not the reasons for terminating my employment because, like Judge Parks and Jenita Ford, she was not around me when the harasser, Eric Jimenez, harassed me relentlessly on numerous times, then discriminated me against.

2.    Emily Montuya, in her March 30, 2007 termination letter, clearly indicated that she acted alone, on her own.   Because she is now caught with her own discriminatory allegations, inaccurate assumptions, and hearsay, she dragged the names of Jenita Ford and Eric Jimenez in her report to the investigator.   For one thing, Jenita Ford was out on her leave of absence (as earlier discussed) and could not have possibly contributed to the rest of my four-month probation period on my job evaluation.

3.    Emily Montuya also alleged that I was not following the instructions from the supervisor.   If ever that was so, the supervisors have the authority to write me up, but

Exhibit ___A-1___
Page __6_of_7_Pages

C. S. Pascual
November 19, 2007 - Rebuttal to Issues.

that thing did not happen because the allegations of Emily Montuya were false.    It was not until after her decision to terminate my employment when she decided to put my job performance and conduct at issue.

4.    If Eric Jimenez (the assumed acting supervisor for Jenita Ford), would have the courage to tell the truth and be honest to himself, he should have given me a good job appraisal to Emily Montuya since I was reporting to him directly and must be quite aware of the quality and quantity of the work I was doing right after my training period.

5.    Emily Montuya barred me from new advanced training like the ones she provided to other employees.

6.    Emily Montuya manipulated the standard one year probationary period procedure for new employees. I was rated as "successful" for the first half of the year. She did not value the proficiency I have demonstrated in performing my job right after my training in December 2006 until she fired me on March 30, 2007.

7.    Emily Montuya favored Eric Jimenez's preferential treatment to younger workers, as discussed in my earlier reports. This clearly challenged my physical and mental capabilities against my age (that Jimenez referred to as "... weak... age... less productive) with regards to my job performance.

8.    Emily Montuya terminated my employment without a job performance appraisal from the assumed acting Group A supervisor, Eric Jimenez. Montuya's lack of business reason for not conducting such a job performance appraisal created an appearance of impropriety in her position as the hearing office director.

9.    Emily Montuya did not follow the Agency's internal procedures.    She did not provide me a counseling that could have alerted me that my job performance and conduct at work were not acceptable. This deviation from normal procedures signals Emily Montuya's pretextual explanation for my discharge.


I strongly believe that the SF-ODAR management team broke the Agency's (SSA) policy prohibiting discrimination and harassment of any kind.  If the Hearing Office director Emily Montuya and supervisor Eric Jimenez feel confident that they can conceal their discriminating intent, then it is more likely that they will continue to engage in discriminatory conduct contrary to the policies of the Agency, and also the more likely the discrimination laws will continue to fail.


What I am seeking in this case complaint is not only justice, but the truth and solutions.
Thank you.

Exhibit _____A-1_____
Page _____7_ of _7_ Pages

## LIST OF WITNESSES' TESTIMONIES

Except those who have already been intimidated by the SF-ODAR management, each listed below is available to speak to the official investigator of my case. The witnesses can be reached at 415-744-3080 - their extension numbers are shown next to their names:

1.   John Heyer (senior attorney) - 3030
     Issues:  Conduct (my demeanor or deportment at the workplace).

2.   Ronald Miecznikowski (senior case technician and one of my trainers) - 3054
     Issues:  My job performance and conduct at the workplace.

3.   Susan Groszkiewicz (claimants' case writer) – 3068
     Issues:  Conduct (my demeanor or deportment at the workplace).

4.   Gregory Mikulan (senior case technician) - 3016
     Issues:  My job performance and conduct at the workplace.
     (This witness is no longer available - initimidation from the management).

5.   Rose Yip (computer administrator) - 3070
     Issues:  My job performance and conduct at the workplace.

6.   Myrna Beza (senior case technician – still on LOA) - 3059
     Issues:  My job performance and conduct at the workplace.

7.   Levardis Smith (senior case technician) - 3052
     Issues:  My job performance and conduct at the workplace.
     (This witness is no longer willing – intimidation from the management).

8.   Diane Ertman (senior case technician, lead, and one of my trainers) - 3021
     Issues:  my job performance and conduct at the workplace.
     This witness is no longer willing (reasons:  she is quite protective of her employment; initimidation from the management).

9.   Bridgett Vaughn (contract-monitor) – cell phone:  510-472-6837.
     Issues:  My monitoring of Judge Parks's hearings in November 2006.
     This witness may or may not be willing to testify  -  she monitors Judge Parks's hearings  on a regular weekly basis.

10.  Judge Cheek (administrative law judge)
     (This judge is no longer available - conflict of interest with the management's)

*[signature]*

Exhibit  1
Page  7  of  10

## BRIEF SUMMARY OF DISCRIMINATION CASE NO.: SF-07-0426-SSA

This summary of the case issues of the above-referenced case is the same case issues discussed in the Investigative File (IF). The case was investigated by Mr. Michael Fleury, a contract investigator of the Social Security Administration-Office for Civil Rights and Equal Opportunity (SSA-OCREO). Copies of the Affidavits and Exhibits copied from the Investigative File (IF) that are cited in this report are enclosed.

During my employment at the Social Security Administration San Francisco-Office of Disability and Adjudication Review (SSA SF-ODAR) from April 23, 2006 until the time my employment was abruptly terminated on March 30, 2007, I have complied with the Agency's rules and regulations as presumed to be part of my employment contract. I performed my duties, as assigned, to the best of my ability, and my job went on smoothly during the first six (6) months of my probation period (IF: Exhibit 6-Job Evaluation) until I was harassed and discriminated against by a new SF-ODAR supervisor, Eric Jimenez, who joined the Agency in October 2006, the same time I was a trainee in processing dismissal cases for the SF-ODAR Judges (IF: Exhibit A-1).

Because I have not previously experienced age discrimination, I do not know it when I saw it and, therefore, I find that it was not easy to prove it because the harasser, supervisor Eric Jimenez, did his harassing and discriminating against me in his own very subtle ways. That is, he made sure that no one was around me in my cubicle to witness his guilt each time he was up to do his discriminatory intentions against me (IF: Exhibit A-1).

I submitted a complaint of discrimination, alleging violations of Title VII of the Civil Rights Act of 1964, to the Social Security Administration San Francisco-Office for Civil Rights and Equal Opportunity (SSA SF-OCREO) on May 21, 2007 based on my age and national origin. I also included workplace harassment in my complaint due to the fact that supervisor Eric Jimenez harassed me, face to face, at the SF-ODAR workplace. Nevertheless, the other three (3) SF-ODAR management team members also discriminated me against because they submitted untrue statements to the Agency's (SSA) investigator of the case, as discussed in my responses to the management's issues, as shown in this report.

The Social Security Administration San Francisco-Office of Disability and Adjudication Review (SSA SF-ODAR) management team members (Chief Judge Benjamin Parks, Hearing Office Director Emily Montuya, Supervisors Jenita Ford and Eric Jimenez) demonstrated an orchestrated effort by submitting false issues against me in order to support their team member Emily Montuya's untruthful issues in her decision to terminate my employment on March 30, 2007 before my probation period was supposed to have ended on April 23, 2007 (IF: Affidavit A and Exhibit A-1).

Page 2/9, 05/23/08   (Brief Summary of Discrimination Case No.: SF-07-04226-SSA)

**For easier reading, herewith are the investigator's 11/14/07 e-mail regarding the management's issues against me and my 11/19/07 responses to each of their issues (IF: Exhibit A-1).   Copies of these documents from the Investigative File (IF) are also provided.**

.Date: Wed, 14 Nov 2007 18:16:26 -0500
From: michael_fleury@verizon.net
Subject: Agency Case No.: SF-07-0426-SSA
To: corazonspascual@hotmail.com

Corazon Pascual

PO Box 471454

San Francisco CA 94147-1454

Re: Agency Case No.: SF-07-0426-SSA

Dear Ms. Pascual:

I tried calling you today, but did not get an answer.

This will serve as notification to you of the substance of Management's articulated reasons for its actions in your complaint.

Issue (1): Complainant alleges discrimination based on Age (67) and National Origin (Filipino) when her employment was terminated effective March 30, 2007

Administrative Law Judge Parks stated the basis for your termination was poor work performance. Parks stated after being training by several different individuals in the office, you were unable to effectively perform all the tasks required by a Case Technician (CT) within your probationary period. Judge Parks stated you did not demonstrate the required level of multi-tasking required for the CT position nor did you demonstrate the ability to retain all the computer systems information presented. Judge Parks said you did not master successfully all the various work-related duties of your position of CT by the time of your termination. Judge Parks said neither your age nor your national origin was a factor in your termination.

Supervisor Jenita Ford testified she did not give any consideration to your National Origin or age in any decisions that she made regarding during your employment.   Ford said during your probationary period, she discussed your performance with you, and shared her concerns about your performance. Ford stated they tried providing different trainers to assist you in learning the job requirements, as some people learn more readily with a certain style of trainer, however, she said the efforts did not result in successful performance. Ford added they also had concerns with your inability to get along with co-workers and tried to help in that area as well by involving you in unofficial counseling to discuss how to improve your relationships with co-workers.

Eric Jimenez stated he did not give any consideration to your National Origin or age in any decisions that he made regarding during your employment. Jimenez said during your probationary period, he provided you performance counseling and feedback on several occasions as required by the Collective Bargaining Agreement.

(cont'n of the investigator's 11/14/07 email letter)

Jimenez declared he never made any unjustified or unnecessary comments to you about your work performance, but stated he discussed the your work performance with you as he does with all employees, and also provided feedback to management about your performance, just as he does with all employees he supervises.  Jimenez declared he did not perceive you as an older worker, and stated he works with employees in all age groups and treats all employees the same. Jimenez said the only comparisons I ever made with you were the comparisons about your performance as compared to other employees doing the same task on both a national and local level. Jimenez stated these comparisons are required as part of the performance feedback provided all employees and is not based upon anything other than task completion, without consideration of things like national origin and/or age of employees.

Emily Montuya testified she signed the letter advising you of the termination of your employment and did so based upon the performance feedback she received from your supervisors, Eric Jimenez and Jenita Ford. Montuya said her decision was based solely on your performance and conduct as a probationary employee. Montuya stated she did not give any consideration to your national origin or age when she made the termination decision. Montuya said she was not influenced in her decision by Jimenez or Ford beyond the performance data they provided.

Montuya stated she based her decision in part of conduct issues she observed during your probationary period, and explained the conduct issues included that you did not like the way co-workers helped her and would complain about it, would gossip about co-workers, and were very aggressive with your supervisors. Montuya stated you would not follow instructions, despite the fact that she explained to you several times that you had to follow the instructions you were given. Montuya said your national origin and age were not factors in your termination during probation.

If you wish to submit a rebuttal statement concerning management's given reason(s) for inclusion in my report of investigation; you may do so within five (5) days. Your statement must be received at my office at the address below, by Fax at 610-458-0290, or via email attachment at my email address below, within five (5) days. I will close the investigative record at the end of that five (5) day period and will not accept any statement received after that for inclusion in my report of investigation, but will send it to the Agency for its consideration in rendering its final decision in your case.

You will receive a copy of the investigative report from the Agency prior to their making a final decision on your case. You will be afforded an opportunity to comment at that time, and will also be given options for further processing of your case. Should you have any questions, please feel free to contact me at your convenience.

Michael D. Fleury

Independent EEO Investigator

363 Whitefield Drive

Jeffersonville VT 05464-4417

Phone: 484-459-8813

Fax:   802-760-3017.   Web: http://www.workforceinitiatives.com

## RESPONSE TO CHIEF JUDGE BENJAMIN PARKS.

Because of  Chief Judge Benjamin Parks' narrower perception of the basic facts of the case issues,  he attacked my job performance and conduct  at work with severe criticizms (IF: Affidavit E and Exhibit A-1).      What hurt here is realizing that Judge Parks has chosen to create false issues as pretext to his team member's (Hearing Office Director Emily Montuya)  untruthful issues  (IF: Exhibit A-1 and Exhibit 2)  to abruptly terminate my employment on March 30, 2007, one month before my one year probationary period was supposed to have ended on April 23, 2007.      Judge Parks  further alleged that  my monitoring of his hearings  in November 2006 were erroneous;   therefore, to rebut his charges,  a brief explanation  is shown (IF: Exhibit A-1 and Exhibit 1, p. 7) below:

> In 11/2006, the group A supervisor, Jenita Ford, scheduled me to observe and monitor Judge Parks' hearings with the contract-monitor Bridget Vaughn. On the 1st hearing, I just observed, then before I monitored the 2nd hearing, Judge Parks asked me to demonstrate the procedure to monitor, and,  when satisfied, he ordered to proceed with the 2nd hearing.  I monitored with Bridget side by side checking my monitoring  and she was my witness that I had no error from start  to finish  (IF:  Exhibit A-1).
>
> Since I have not done any monitoring of judges' hearings all by myself since 11/2006, I brushed up my monitoring skills with another contract-monitor. Then towards the end of 03/2007, I asked Emily Montuya why I was not getting any monitoring job. She told me just to wait, but then sadly  and unexpectedly, she shocked me with a termination letter on March 30, 2007,  one month before my probationary period was supposed to have ended on April 23, 2007.

In another issue,  Judge Parks mentioned  that  neither my age nor my national origin was a factor in my termination.   Judge Parks could say that  because he was not there when the group B supervisor,  Eric Jimenez,  made those age  remarks (i.e., weak…age…less productive) regarding my physical and mental capabilities to perform  my assigned  cases (IF: Exhibit A-1).    The  Judge  further  alleged  that I was trained by several individuals.   False.   It was only the senior case technician Ronald Miecznikowski who trained me on  the various concepts of processing dismissal cases.   For a short time, the group lead Diane Ertman  trained me but  she went on vacation for 45 days  or so starting January to February 2007,  so  Ron Miecznikowski took over.  Jenita Ford instructed the other lead Stacy Bastian to train me, but Stacy did not comply  (IF: Exhibit 2, p. 26).

Judge Parks  further  argued in his statements  to the investigator  that I  was not successful or not learning my work-related duties  during my probation period.   He also alleged that  I was unable to master the computer systems information.   The Judge was entirely wrong.   I became proficient in closing dismissal cases starting in December 2006 (right after my training) and the  following are proofs that   Judge Parks's  allegations  are  false:

Page 5/9, 05/23/08    (Brief Summary of Discrimination Case No.: SF-07-04226-SSA)

(a) I was able to assist frequently Gregory Mikulan (assistant to Judge Ashmeyer) and Angel Figueros (assistant to Judge Lee) in processing their assigned cases whenever they were overloaded with their Judges's stuffs.

(b) In addition to assisting other senior case technicians in their assigned cases, whenever time permits, I also processed, as assigned to me, a lot of dismissal cases for Judge Parks whenever his assistant (Lee Levardis) was quite busy. I never got any major complaint about errors. I personally delivered my processed cases to Judge Parks for his signature before mailing them to the district office; he examined the cases and no comment except "thank you."

The above discussion prove my proficiency in using computer software and programs, otherwise, there could be no way for me to process dismissal cases. Unfortunately, the SF-ODAR management is still withholding my folders of correspondence evidence that would refute further the management's allegations regarding my job performance. The investigator of the case had missed to request these evidence from the SF-ODAR management during the investigation of the case.

## RESPONSE TO SUPERVISOR JENITA FORD.

Like Judge Parks, Jenita Ford was not also around me when Eric Jimenez made those discriminatory remarks. I certainly do not blame her for saying that age and national origin were not factors in my job termination. Jenita Ford, however, surprised me about her report of poor job performance and inability to get along with co-workers. I have no idea that she had these allegations. In fact, she contradicted herself in her report to the investigator. She rated my job performance as "successful" from April 2006 to September 2006 and the supervisor Jenita Ford and I signed the evaluation document on October 30, 2007 (IF: Exhibit 6).

Of course, Jenita and I had minor misunderstanding in the past, but then I thought we already made up and started being honest and just focus on the job. I confidently talked to Jenita about my personal economic problems. I appreciated her assisting me search for a better paying job and, with her permission, I made her as my work and character reference in my job search. But now it would be without good sense if I would still keep her as such.

Since Jenita Ford was not almost around during the last four months of my probation, she did not witness or observe how I became proficient in processing dismissal cases and performed my other assigned jobs. I wonder if she was in a position to evaluate the second half of my probation because for almost the entire month of December 2006 she was on her Christmas holidays and came back to work in the middle of January 2007, then took a few more months Leave of Absence (LOA) starting the early part in February 2007 until my job was

Page 6/9, 05/23/08   (Brief Summary of Discrimination Case No.: SF-07-04226-SSA)

terminated on **March 30, 2007** and she was not back yet.    In other words, she did not witness the height of my being proficient in my assigned jobs (IF: Exhibit A-1).    Again, it was only the senior case technician, Ronald Miecznikowski, who trained me in my new job -- processing dismissal cases on the computer.    Noother trainers, as Jenita also claimed that there were different individuals who trained me.    She assigned another lead Stacy Bastian, but Stacy did not comply (IF: Exhibit 2).

**Jenita Ford's issue about my not getting along with co-workers (IF: Exhibit A-1). So far, I could not think of when and over what Jenita Ford said she counseled me on this issue. The truth is, it was the friends of Eric Jimenez who caused problems (IF: Exhibit A-1):**

> (a) Erlinda Molar (younger co-worker and friend of Jimenez). She made me look bad in the eyes of Jimenez when she reported that I refused to photocopy her stuff which was not true. Then Molar apologized.

> (b) Myrna Beza (one of my witnesses but still on her LOA). She reported to Jenita Ford that I refused to help a claimant which was wrong. Beza apologized and hugged me and invited me to spend my Christmas 2006 with her family, but I was not able to make it.

## RESPONSE TO SUPERVISOR ERIC JIMENEZ.

The SF-ODAR group B supervisor, Eric Jimenez, joined the Agency in October 2006, the same time I was a trainee in processing claimants' dismissal cases for the SF-ODAR Judges. It was during this time when he started harassing then discriminating me against at the workplace.  He perceived me as an old worker – weak and less productive (IF: Exhibit A-1).    During my training period in October 2006, supervisor Eric Jimenez made unjustified and unnecessary comments about the number of cases I processed which, he said, was not worth the pay I was receiving from the Agency (IF: Exhibits 2 and A-1).    He made the same comments in our meeting with the HOD Emily Montuya in November 2006.  I also reported this issue to Judge Benjamin Parks also in November 2006 but, like Emily Montuya, he did nothing about it.

Supervisor Eric Jimenez further harassed me with his persistent observing or stalking within my workplace. He acted like a "vulture" to spy on me from time to time – either walking around my cubicle to check what I was doing or surprisingly get into my cubicle to count the number of cases I already processed (IF: Exhibit A-1 and Exhibit 2, p. 9).

Eric Jimenez also acted in a most particularly cruel manner when he yelled at me, "…go back to your desk and work…."    That time I asked him for the second

time about credit hours.    In our meeting with Emily Montuya in November 2006, he denied his inappropriate act, but later admitted it when trapped with evidence (witnesses) to prove that he did it (IF: Exhibit A-1 and Exhibit 2).

For the supervisor, Eric Jimenez, harassments were not enough for me to endure. He made me an easy prey on his discrimination perception of my capabilities.   Thus, out of ignorance or bias, Eric Jimenez disregarded my actual state of physical and mental ability to perform my job.   He relied upon my age to doubt my capabilities, thereby, subjected me to treatment that differed substantially from that of a younger co-worker's.   Eric Jimenez is fond of associating himself with the younger set, he oftentimes makes preferential treatment to them (IF: Exhibit A-1).   For example, with his false belief that older worker, like me, couldn't be trained anymore effectively, he trained a younger employee, Erlinda Molar, on the new codes to process claimants' cases.    I discussed this issue with the HOD Emily Montuya, but I was surprised to hear that she was, in fact, in favor of what Jimenez did because, she said, Molar has enough experience than I do and therefore she could easily pick up (IF: Exhibit A-1).    I responded that there is no clear-cut way to measure one's ability regardless of anyone's length of  experience;  besides, I was the one who needed help so badly being a fairly new employee then and was still a trainee.   Emily Montuya did not want to hear my reasons, she said I was argumentative, but  then I also said that I could be one but for the right reasons only.

Eric Jimenez also singled me out  when he habitually made sarcastic comments about my strong unusual accent . He never did these insulting comments to three co-workers of my origin and he made sure he made his criticizms in my cubicle alone (IF: Exhibit A-1).    Further, Eric Jimenez centered his defense upon his argument that he could not have possibly discriminated me against because of his association with Montuya who has the same origin as mine.   However, Eric Jimenez shrewdly did not consider the fact that he has to deal with Montuya whether he likes it  or not – she is his supervisor.   Eric Jimenez is also forgetting the notion that  sometimes people may like a group of people of the same origin,  but at the same time also dislike a few of them, like in my case.

As usual, Eric Jimenez lied  in his statements to the investigator and even mentioned the Collective Bargaining Agreement (as he bragged at the workplace that he was a  union representative in the past.   If that was so, he should have applied the basic policies or principles of the union for the employees's  sake).   He definitely lied to the investigator  that he counseled  me and gave me feedback about my performance.    The truth is, the only thing he did was to pressure me to produce more.   When he  got on board in October 2006,  as my supervisor then, he asked me to sign  a form that concerns  the job expectations  new employees should be aware of.    At that time,  he also used his discriminatory supervisory power to warn me that  he will  initiate a disciplinary action against me  if ever I will not be able to   raise the  number of cases I processed  per day  (that time in

Page 8/9, 05/23/08   (Brief Summary of Discrimination Case No.: SF-07-04226-SSA)

October 2006 -- I was still a trainee).   He also bragged about his firing of his employees from his last job (IF: Exhibit 2).

## RESPONSE TO HEARING OFFICE DIRECTOR (HOD) EMILY MONTUYA.

The Hearing Office Director, Emily Montuya, lied on the basic factual issues of the case in order to adversely terminate my employment on March 30, 2007.  She has no evidence or witnesses to back up her allegations, and it was not until after her decision to terminate my employment when she decided to put my job performance and conduct at issue (IF: Exhibits A-1 and 2).   Emily Montuya disregarded enthusiasm and dedication to my work.  She did not value the fact that I was already proficient in processing cases for the judges except during the early part in 01/07, I slowed down due to my health condition; nevertheless, I was still coming to work because we were understaffed (IF: Exhibit 2, p. 7).

Emily Montuya manipulated the procedure for the standard one-year probationary period for new employees. I was rated as "SUCCESSFUL" during the first six (6) months of my one-year probation (IF: Exhibit 6), then on the next half, she did not value the proficiency I have demonstrated in my job beginning December 2006 (right after my training) until she abruptly fired me on March 30, 2007, one month before my one-year probation period was supposed to have ended on April 23, 2007 (IF:  Affidavit A and Exhibit A-1).

Moreover, Emily Montuya also mentioned that age or national origin were not the reasons for terminating my employment.  She could say that because, like Judge Parks and Jenita Ford, she was not around me when the harasser, Eric Jimenez, harassed me relentlessly on numerous times, then discriminated me against on different occasions, as earlier discussed  (IF: Exhibit A-1 and Exhibit 2).

Because Emily Montuya was caught with her own discriminatory allegations, inaccurate assumptions, and hearsay, she dragged the names of Jenita Ford and Eric Jimenez in her report to the investigator.   For one thing, Jenita Ford was out on her long leave of absence (LOA) and could not have possibly contributed to the rest of my four (4) month probation period's job evaluation, as discussed (IF: Exhibit A-1).   Emily Montuya also alleged that I was not following the instructions from the supervisor (IF: Exhibit 2, p. 9).  If ever that was so, the two supervisors, Jenita Ford and Eric Jimenez, have the authority to write me up, but that thing did not happen because the allegations of Emily Montuya are entirely false.   It was not until after her decision to terminate my employment when she decided to put my job performance and conduct at issue (IF:Exhibit A-1).

Emily Montuya terminated my employment without a job performance appraisal from the assumed acting Group A supervisor, Eric Jimenez. If Eric Jimenez (the assumed acting supervisor for Jenita Ford's long leave of absence), would have the courage to tell the truth and be honest to himself,

Page 9/9, 05/23/08  (Brief Summary of Discrimination Case No.: SF-07-04226-SSA)

he should have given me a good job appraisal to Emily Montuya since I was reporting to him directly and must be quite aware of the quality and quantity of the work I was doing before and after my training period. Emily Montuya's lack of business reason for not conducting such a job performance appraisal created an appearance of impropriety in her position as the Hearing Office Director.    Emily Montuya was unduly soft in resolving issues as she acted like a rubber stamp to please and protect employees she favored and, of course, to protect her position, as well.

Emily Montuya, undoubtedly, did not follow the Agency's internal procedures.  She did not provide me a counseling that could have alerted me that my job performance and conduct at work were not acceptable.   This deviation from normal procedures signals Emily Montuya's  pretextual explanation for my discharge.   Thank you.

Enclosures: Copies of Documents from the Investigative File (IF)cited in this report.



# SOCIAL SECURITY

MEMORANDUM

Date:       March 30, 2007

To:         Corazon Pascual, Case Technician
            San Francisco Office of Disability Adjudication and Review

From:       Emilia Montuya, Hearing Office Director
            San Francisco Office of Disability Adjudication and Review

Subject:    Termination of Employment

Effective April 24, 2006, you were employed by the Social Security Administration (SSA) as a Case Technician (CT) in the San Francisco Office of Disability Adjudication and Review in a career-conditional appointment subject to completion of a one-year probationary period. You are currently a GS-986-6.

This memorandum serves as notice of my decision to terminate your employment prior to the expiration of your one-year probationary period in accordance with Title 5 Code of Federal Regulations Section 315.804. This termination is based on your unacceptable performance and unprofessional conduct in a work-like setting. Namely, your performance is unacceptable during this time period; you fail to follow instructions from your supervisors and you conducted yourself in a discourteous and unprofessional behavior towards members of management and co-workers during your period in the office.

You have not performed at an acceptable level. You failed to grasp basis concepts required to successfully process your assigned tasks. Specifically, you have not demonstrated appropriate proficiency in closing and mailing cases and preparing the cases for review and use by the Administrative Law Judges. Your need for constant reminders and retraining in rudimentary tasks in the office have made it difficult to rely upon you to perform some of the essential elements and standards of your position such as associating mail and monitoring hearings. Despite step-by-step instruction, you continue to make substantial errors in your work product and to take inordinate amounts of time to process simple tasks that could be performed more quickly. Your performance deficiencies are exacerbated by your ongoing refusal to accept constructive feedback or correction from various supervisors and co-workers who have on numerous occasions worked with you to train you or improve your performance.

Additionally, you have not displayed the required interpersonal skills and demeanor necessary to work successfully with the Hearing Office management and staff as a contributing team member. You have been rude or aggressive towards co-workers

Exhibit 5
Page 1 of 3

including those assigned to provide guidance to you. You have also been insolent towards your Supervisors, often resisting and/or refusing to follow instructions given to you. For example, on one occasion, a Supervisor inquired about the length of time taken to complete a work assignment. You gave the Supervisor a flippant response that ended with your saying ".... So just stay put, I'm doing all what I could. Okay?"

You have received training, step by step instructions and guidance from Lead CTs and management; however, you could not perform the full range of duties assigned to you without extensive assistance. In addition, each member of management has had to discuss your rude and unprofessional conduct towards supervisory staff and employees. In spite of numerous attempts to assist you with improving your performance and conduct, you still failed to perform your duties successfully or behave courteously and those problems persist. This leads me to conclude that you cannot perform the CT duties or properly assimilate with the current staff.

The probationary period is an opportunity to demonstrate your fitness and capacity for government service and your qualification for retention as a career employee. This period provides an opportunity for you to demonstrate your qualifications and ability to perform the job. When you were initially hired as a CT, you signed a statement acknowledging the fact that your failure to meet the conditions of your appointment, including satisfactory performance and conduct, would result in termination from your appointment. A copy of that statement was placed in your Official Personnel File.

You have failed to demonstrate the skills and qualifications required to become a successful employee with the SSA. Consequently, you will be terminated prior to the expiration date of your one-year probationary period and you will not be converted to a permanent career appointment.

The effective date of your termination is **March 30, 2007**

A Standard Form 50, Notice of Personnel Action documenting your termination will be forwarded to you when available.

If you believe that the action taken against you was based in whole or in part on discrimination on the basis of your race, color, religion, national origin, sex, sexual orientation, age, parental status or physical or mental disability, you may consult an Equal Employment Opportunity Counselor under Part 1614 of the Equal Employment Opportunity Commission regulations within 45 calendar days after the effective date of this decision letter. You may contact a counselor by calling the Civil Rights and Equal Opportunity (CREO) Office at (510) 970-8421.

If you believe that this action was based in whole or in part on your marital status or political affiliation, you have the right to appeal this action to the Merit Systems Protection Board (MSPB), 250 Montgomery Street, Suite 400, 4th Floor, San Francisco, CA 94104 under Part 315 of the Code of Federal Regulations. To be timely, an appeal to MSPB must be filed anytime during the period beginning with

Exhibit _5_
Page _2_ of _3_

the day after the effective date of this action and ending thirty (30) calendar days after that date.

If you have any questions concerning your rights or the procedures followed in this case, you or your representative may contact Brenda Higdon, Labor and Employee Relations Specialist, at (510) 970-2856.

*Emilia Montuya*

Emilia Montuya

cc:   SF-7B
      CHR-LERT

**Acknowledgement of Receipt:**

*Paragon S. Pascual*  Date: *March 30, 2007*
Employee's Signature

*I do not agree with the allegations
stated on this letter of termination.
                        March 30, 2007*

Exhibit 5
Page 3 of 3

**Response to 03/30/2007 Termination Letter**
**From: corazon pascual (corazonspascual@hotmail.com)**
**Sent: Mon 4/30/07 10:14 PM**
**To:    Emily.Montuya@ssa.gov**
**Cc:    corazonspascual@hotmail.com**

Because the truth is so important to me, I have thought of responding
to your range of issues as stated in your above-referenced letter. Your
allegations: (a) Unacceptable performance and (b) Unprofessional
Conduct -- are not only biased but inaccurate and, therefore,
need to be addressed. Witnesses (employees who were involved in or
aware of) and proofs/evidence are provided to each of my responses as
discussed below:

Third paragraph of your letter.
(1) Issue: Performance. (a) "...failure to grasp basic concepts to
process assigned task..."

Responses.

I was hired at SF-ODAR on 04/24/2006 as a Legal Assistant/Case
Technician-GS-6. My first assignment was the Front Desk for five months
answering claimants' and their representatives' technical or non
technical inquiries or referring their calls to individuals, as
appropriate. In the middle of September 2006, Diane Ertman (lead)
trained me for a short time to close dismissal cases, then you assigned
SCT Ron Miecznikowski in Diane's. Ron showed me from head to toe the
procedures and the fastest way to process dismissal cases, so, during
the last weeks of October 2006, I was already doing the job without his
assistance except for certain items I haven't encountered yet during
the training. The Group A supervisor, Jenita Ford, checked thoroughly
the first cases I have closed, then said "good job". By the same token,
you, Emily, also checked the work I have done and then you said "okay".
Since I was not getting any feedbacks or comments about errors from
Ford nor from you nor from the leads, I was assuming then that I was
doing fine. During the weeks in December 2006, I worked with you, Ron
Miecznikowski, Diane Ertman, and another lead, Stacey Bastian.
Bastian noticed that almost everyday I was able to process and mail 7
dismissal cases with accuracy before the end of the day. She flattered
me and said, "...fast worker..." in the presence of Miecznikowski who
was also agreeing (seven cases is the maximum to be processed daily).
(Proofs: Copies of processed cases and other work done (still being
withheld by the management)
(Witnesses: Emily Montuya, Jenita Ford, Ron Miecznikowski, Diane Ertman,
and Stacey Bastian)

In September 2006, Ford and I also had some miscommunication or
misunderstanding about certain issues, therefore, I sent her an email
(you have a copy) to this effect. After clarifying our stands on the
issues, we made up forgiving and understanding each other's and worked
harmoniously as a group since then. She evaluated my work
performance on October 30, 2006 as "SUCCESSFUL" because she
believes I was doing my job to the best of my ability.
(Proof: Your copy of the evaluation, the original was sent to the RO
Personnel Office)

(2) Issue: Performance. (b) "...could not associate mails ..."

Responses.

My first assignment at the front desk for five months gave me the experience to familiarize myself with the sorting out, pulling up claimants' case histories from the computer and associating them with the new mails as they became available. As I processed the dismissal cases, I added new mails (evidence) to the exhibit lists to be used as reference materials for the judges' hearings. And I also updated the judges' hearings' statuses before filing the case history folders.

(3) Issue: Performance. (c) "...monitoring judges' hearings ..."

Responses.

In November 2006, Ford scheduled me to observe the hearings of Judge Parks with Bridgett (contractor) as the monitor. Before the second hearing started, the judge asked me to demonstrate the complete monitoring steps; and when the judge was satisfied, he ordered to start the hearing. I monitored the hearing from start to finish (as Bridgett watched). That was the first and last monitoring business I have had in November 2006. Then in January 2007, Ford assigned me to monitor Judge Lewald's hearings, but the judge did not approve it because of my illness -- too much coughing.
(Witnesses: Judge Benjamin Parks, Bridgett, Judge Lewald, and Jenita Ford)

Additional responses.

Emily, you would recall that before you went on vacation from 03/19/2007 to 03/26/2007, I requested you to instruct the leads to schedule me
for some monitoring jobs as I was concerned I might lose the skills I had acquired in November 2006. I also said that I could type the judges'decisions either from tapes or from handwritten materials. During my early months with the Agency, I mentioned to you that I could also serve as a writer for the judges' decisions since I was trained and gained experience in the graduate school -- writing analytical essays, reports/proposals or narratives of any kind.
(Witness: Emily Montuya)

(3) Issue: Performance. (d) "... substantial errors in work product..."

Responses.

In addition to my regular duties -- closing dismissal cases, updating the judges hearings' statuses, adding mails to the exhibits, and the usual front desk job, I also helped the leads and the other SCTs in processing their assigned cases, as needed. Additionally, I frequently assisted SCT Gregory Mikulan to process his assigned cases whenever he felt he was overloaded with Judge Ashemeyer's stuff. During the early part of January 2007, I must admit I slowed down for a couple of weeks due to my health condition; nevertheless, I was still coming

to work because we were understaffed . In February 2007, I was
again processing 7-8 (or more) dismissal paper cases per day or 7
electronic case files per day. To cite one proof: In March 2007,
I'm sure you noticed that everytime I finished whatever number of cases
you put on my desk in the morning, I still begged for more as I was
concerned for us trying hard to be able to reach even half of the
Region IX's goal score for the month of March 2007. For this reason, I
saw to it that I closed and mailed the 7-8 cases Jimenez routinely
assigned me in an expeditious and accurate manner. I'm certain
Jimenez already noticed that for the past three months (before your
03/30/2007 termination letter) I was already proficient in processing
dismissal cases as he was surprised when I processed in less than 4
hours the 7 cases he gave me on 03/28/2007. Apparently, Emily, you
were also assigning me cases to process which proved that you were
also very much aware of my job performance. If there were
substantial errors or if ever I could not close cases in a short
period of time, the leads and the SCTs could have already reported
me to Jimenez, the acting supervisor for Jenita Ford (Jenita is on
leave since the middle of February 2007). Undoubtedly, Jimenez was
very much aware of the quality and quantity of the work I have been
doing since I was reporting to him directly for work assignment. And if
Jimenez would have the courage to tell you the truth, he would say that
I was already proficient in my assigned duties, especially the
processing of dismissal cases, since December 2006.
(Proofs: #1a discussion, copies of processed cases & other work done
(still being withheld by the management)
(Witnesses: Emily Montuya, Eric Jimenez, Ron Mieczsnikowski, Diane
Ertman,Stacey Bastian and Greg Mikulan)


**Further responses to your allegations.**

Thus, because of the proximity of my cubicle to your office, in
addition to the dismissal cases to be processed and the front desk jobs,
you also gave me photocopying, MIMs, filing, purging, and shredding,
and other stuff that needed to be done immediately. More often than not,
the leads could not give me additional work as they noticed I was
always loaded with cases to close and plenty of photocopying you and
Jimenez assigned me to do. In other words, you confined my duties
mostly on closing cases, photocopying, and filing but never gave me a
opportunity to learn and do other things a case technician should also
be doing to assist the judges in accomplishing their tasks. Thus,
although you were also aware of my other skills, knowledge, and
abilities, you obviously did not give me a chance to use them (e.g.,
typing/editing the judges' decisions, etc.) to prove that I could do
something more for the Agency.
(Witnesses: Emily Montuya, Eric Jimenez and leads Diane Ertman and
Stacy Bastian.


Fourth Paragraph of your letter.
(1) Issue: Conduct. (a) "...rude or aggressive towards supervisors and
co-workers..."

**Responses.**

To my knowledge, I was not rude to any of the two supervisors or

4

co-workers at work. I never raised my voice to offend anyone in the office. Your letter did not specify any incident that occurred as to when or who I was rude to. If you would review my emails and Jimenez' emails, you would know exactly who was rude at work. For example, on 11/20/2006, I happened to ask Jimenez more than once about working for credit hours; he got irritated and suddenly yelled at me from his cubicle, "...go back to your desk and work...". I reported this incident to you that same morning but you just took it for granted and did nothing about it. Because of that incident, I requested a meeting with you and Jimenez on 11/21/2006; at first, Jimenez denied yelling at me, but later admitted it when I said there were witnesses. My 12/04/2006 (you have a copy) further describes, without exaggeration, Jimenez' inappropriate actions. Since then, I went through a lot of emotions that I felt I should send him emails and which you may have, perhaps, referred to as rude. Frankly speaking, those emails' issues (Jimenez' and mine) were blown out of proportion after you inaccurately applied your own version on them. For example, you quoted me in one of my emails to Jimenez, "...just stay put.....I'm doing all what I could...okay? Here, I was just trying to communicate with Jimenez in a very casual manner. And to emphasize our personal honesty in dealing with the issues, please read back the emails and you will realize that my email was not a "flippant" (disrespectful) one (which you said it was) but a simple "direct to the point" one. Although you and Jimenez refused to give me a copy of that particular email, I could still vividly remember what was said in his email and in mine. Per his email, he was actually "TELLING me and NOT INQUIRING" about the length of time to finish those four cases; my response was, "... if I were not to do the front desk duties, I could process and mail those 4 cases in less than two hours..." (which is even faster than the 2 hours or more Jimenez had anticipated to do the job). Besides, you could have counselled me if, in your opinion, my statement was offending. But, as usual, I never heard from you just as you let problems at work passed by unresolved. Your allegation that I was rude may have been caused by your deliberate and erroneous dispositions in interpreting the emails' messages, instead of dealing with the truth of the mattter, as presented. Nonetheless, that particular email where you quoted me from also proved that I was already proficient in my assigned duties, such as, processing dismissal cases in a short period of time (i.e., lesser time for me to do the job compared to Jimenez' more time to finish the job). My emails may have seemed to be tougher and meaner to you, but if you have given them further thoughts and understanding, you would be enlightened that my issues were in reality just "THE TRUTH -- NOTHING BUT THE TRUTH!" Evidently, those inappropriate actions originated from Jimenez and not from me. I was just provoked to respond. Emily, like you, I am just a human being with feeling and emotions -- subject to err and also subject to react to afflictions. Eric Jimenez started working for SF-ODAR in October 2006 (the same month I was still on training on closing dismissal cases). During those days, other employees and I have observed that it became his leisure, like a "vulture", to spy on me from time to time just to check what I was doing then counting the number of dismissal cases or discs I had been working on. Sometime in November 2006, I was shocked when he told me the first time (then he repeated making the same remarks for a few times more) that the work I was producing was not worth the "PAY" I was receiving from the Agency. I then replied that I was still a trainee and therefore I was closing cases at my own pace as

I have been wanting to learn to do my job well. I also emphasized to
him that if an employee is properly trained, he/she will likely to
become a good material to the organization/agency. I further mentioned
to Jimenez that we are working for the federal government and not for a
factory where the workers' wages are computed by the number of pieces
they produced. Conversely, there were also times when he would say,
"... it's almost 12 noon...is that all you have finished... you cannot
move fast ... why... is it because you are weak ... ... you have a lot
to do..." Honestly, I did not appreciate Jimenez' remarks as they
deterred my goal to do my job properly and expeditiously. Needless to
say, Eric Jimenez, according to my sources (names will be revealed upon
request), has a pattern of harassing employees he dislikes, like in my
case.  Consequently, Jimenez again mentioned the " PAY" issue in our
11/21/2006 meeting with you (noted in my 12/04/2006 email - you have a
copy).

Basically, I observed that your presence in any of my meetings with
Jimenez was not providing a solution to the problem. It seems that the
way you treat problem issues among employees creates an appearance of
partiality because you acted more of a note taker than a problem
solver. Of course, I am not to tell you what you should have, perhaps,
done to resolve problems at work; but, perhaps, you could have
offered more flexibility in resolving problems if you, at least, have
done some counselling to both parties involved in the issues. But you
never did any, so far. (Wiitnesses: Emily Montuya, Eric Jimenez, and
Sources - names will be furnished later with permission)

(2) Issue: Conduct. (b) "... refusal to follow instruction..."

Responses:

I could confidently tell you that I have never refused constructive
feedback from the two supervisors or leads or co-workers at work.
If you recall, I have mentioned to you once or twice that I was truly
bent on working hard on my assigned duties and, therefore, I have been
interested to receive constructive feedbacks to add more improvement in
my assigned duties. But I could not remember any instance that I
received or refused feedbacks from you, nor from Ford, nor from
Jimenez. I saw to it that I constantly checked with you what you
wanted me to do since Jenita Ford's absence, and I never refused your
instructions as well as the others'. And since I was also aspiring
for promotion, it never came to my mind to refuse constructive
feedbacks that would surely lead me to new avenues for advancement.
(Witnesses: Emily Montuya, Eric Jimenez, Diane Ertman, and Stacy
Bastian)

5th paragraph of your letter.
Responses to: (c) "...extensive assistance ..."

There are two leads -- one for Group A - Stacy Bastian and another for
Group B - Diane Ertman. Ertman has already done a lot of assistance
especially during my training period. But Bastian has not. That is,
whenever I needed assistance, Bastian would either say she was busy or
giving me all kinds of excuses. For example, when Ertman was on leave
in January 2007, I asked Bastian to assist me to close an electronic
case file, she reasoned that she was busy, so I asked Rose Yip to

assist me, instead. Yip was surprised why Bastian could not help. Although Jenita Ford instructed Bastian to train me on electronic files, Bastian did not comply completely. She did it on a piece meal basis and never completed the training with me . On another occasion, I asked her about a disposition Judge Gaye made because I could not move on to close a case; instead of helping me, she just told me, "...see the judge, ...see the judge..." Jimenez heard my conversation with Bastian and he could not deny that. That email I sent to Bastian sometime in February 2007 (you have a copy), describes how she treated a case problem and also how she had been treating me at work. Actually, I was quite hesitant to send that email to Bastian because I was cautioned by a few co-workers that Bastian is a close personal friend of Judge Parks since they were together in Oakland. But because I wanted to inform Bastian what actually transpired when she panicked on handling a particular case problem, as described, without exaggeration, in my 02/26/2007 email (you have a copy), I still sent it to her with the thought that, perhaps, Judge Parks would judiciously exercise his power in judging the situation fairly.
Witnesses: Jenita Ford, Eric Jimenez, Stacy Bastian, and Rose Yip)


CONCLUSION.

Emily, in view of the reasons, witnesses , and proofs/evidence I have presented on this report, I strongly believe that you have formed a biased decision with your false allegations as your ammunitions to terminate my employment. In your position as the ODAR's Hearings & Appeals director, people would assume that you are aware of the fact that you cannot just fault a person with any wrongdoing without sufficient accurate evidence. The fact that I never had any counselling with you about my job performance or conduct, it clearly indicates that you used your power for your own convenience to protect your position and acted like a  rubber stamp for those you wanted to please and protect, as well, in order to fire me. Evidently, I also believe that deception of any kind in dealing with the issues is not good, just as power and wealth are not everything in this world, I am pursuing this case, therefore, to seek justice through the OCREO. I am designating, with his permission, the Union officer, Duane DeJoie, as my personal representative. Thank you.

Corazon S. Pascual
(former SSA-SF-ODAR employee)

Carter, Carol L.

| From: | corazon pascual [corazonspascual@hotmail.com] |
|---|---|
| Sent: | Wednesday, April 18, 2007 5:43 PM |
| To: | Montuya, Emily |
| Cc: | Parks, Benjamin; Carter, Carol L.; uxmal@comcast.net |
| Subject: | Response to 03/30/2007 Termination Letter |

| Follow Up Flag: | Follow up |
|---|---|
| Flag Status: | Red |

Because the truth is so important to me, I have thought of responding to your range of issues as stated in your above-referenced letter. Your allegations: (a) Unacceptable performance and (b) Unprofessional Conduct -- are not only biased but inaccurate and, therefore, need to be addressed. Witnesses (employees who were involved in or aware of) and proofs/evidence are provided to each of my responses as discussed below:

Third paragraph of your letter.
(1) Issue: Performance. (a) "...failure to grasp basic concepts to process assigned task..."

Responses.

I was hired at SF-ODAR on 04/24/2006 as a Legal Assistant/Case Technician-GS-6. My first assignment was the Front Desk for five months answering claimants' and their representatives' technical or non technical inquiries or referring their calls to individuals, as appropriate. In the middle of September 2006, Diane Ertman (lead) trained me for a short time to close dismissal cases, then you assigned SCT Ron Miecznikowski in Diane's. Ron showed me from head to toe the procedures and the fastest ay to process dismissal cases, so, during the last weeks of October 2006, I was already doing the job without his assistance except for certain items I haven't encountered yet during the training. The Group A supervisor, Jenita Ford, checked thoroughly the first cases I have closed, then said "good job". By the same token, you, Emily, also checked the work I have done and then you said "okay". Since I was not getting any feedbacks or comments about errors from Ford nor from you nor from the leads, I was assuming then that I was doing fine. During the weeks in December 2006, I worked with you, Ron Miecznikowski, Diane Ertman, and another lead, Stacey Bastian. Bastian noticed that almost everyday I was able to process and mail 7 dismissal cases with accuracy before the end of the day. She flattered me and said, "...fast worker..." in the presence of Miecznikowski who was also agreeing (seven cases is the maximum to be processed daily). (Proofs: Copies of processed cases and other work done (still being withheld by the management)
(Witnesses: Emily Montuya, Jenita Ford, Ron Miecznikowski, Diane Ertman, and Stacey Bastian)

In September 2006, Ford and I also had some miscommunication or misunderstanding about certain issues, therefore, I sent her an email (you have a copy) to this effect. After clarifying our stands on the issues, we made up forgiving and understanding each other's and worked harmoniously as a group since then. She evaluated my work performance on October 30, 2006 as "SUCCESSFUL" because she believes I was doing my job to the best of my ability.
(Proof: Your copy of the evaluation, the original was sent to the RO Personnel Office)

(2) Issue: Performance. (b) "...could not associate mails ..."

sponses. .

My first assignment at the front desk for five months gave me the experience to familiarize myself with the sorting out, pulling up claimants' case

1

from the computer   and associating them with the
new mails   as they became available.    As I processed the dismissal cases,
I added new mails (evidence) to the exhibit lists   to be   used   as
reference materials   for    the judges' hearings.    And   I   also updated
the judges' hearings' statuses before filing the case history   folders.

3)   Issue:   Performance.   (c)   "...monitoring judges' hearings ..."

Responses.

In  November 2006,    Ford   scheduled me   to observe   the   hearings of Judge
Parks   with Bridgett (contractor)   as the monitor.   Before the second
hearing started,     the judge asked me to demonstrate   the   complete
monitoring steps;   and when the judge was satisfied,   he ordered to start
the hearing.     I monitored the hearing   from start to finish   (as   Bridgett
watched).    That was the first and last monitoring business I have had in
November 2006.         Then   in   January 2007,   Ford   assigned   me to monitor
Judge Lewald's hearings,    but   the judge did not approve it   because of
my illness -- too much   coughing.
(Witnesses:   Judge Benjamin Parks,   Bridgett,   Judge Lewald, and   Jenita
Ford)

Additional responses.

Emily,   you would   recall that    before you went on vacation from 03/19/2007
to 03/26/2007,   I   requested you   to   instruct the leads to   schedule   me for some
monitoring jobs as I was concerned   I might lose the skills I had
acquired   in November 2006.       I   also said   that I could type the judges'
decisions   either from   tapes or from handwritten materials.      During my
early months with the Agency,   I mentioned to you that   I could   also
serve as    a writer   for    the judges' decisions since I was trained   and
gained   experience in the graduate school --   writing analytical essays,
reports/proposals   or   narratives of any kind.
(Witness:   Emily Montuya)

(3)   Issue:   Performance.   (d)   "... substantial errors in work product..."

Responses.

In addition to   my regular duties   --   closing   dismissal cases,   updating the judges
hearings' statuses, adding   mails to the exhibits, and the usual
front desk job,    I   also helped    the leads   and the other SCTs   in
processing their assigned cases,   as needed.    Additionally,   I   frequently
assisted SCT Gregory Mikulan to process his assigned cases   whenever   he
felt he was overloaded   with Judge Ashemeyer's   stuff.      During the
early part of January 2007,    I must admit   I slowed down   for a couple of
weeks   due   to   my health condition;    nevertheless,   I   was still coming
to work because we were understaffed .     In    February 2007,   I   was
again   processing   7-8 (or more)   dismissal paper cases per day   or   7
electronic case files per day.       To cite one proof:   In   March 2007,
I'm sure    you   noticed that everytime I finished   whatever number of   cases
you put on my desk in the morning,   I still begged for more   as   I was
concerned for us trying   hard   to be able to   reach even half of   the   Region
IX's goal   score   for   the   month of   March 2007.    For this reason,   I
saw to it that I closed   and mailed the 7-8 cases   Jimenez   routinely
assigned me in an expeditious and accurate manner.    I'm certain
Jimenez    already noticed   that for the past three months   (before your
03/30/2007 termination letter)   I was already proficient   in processing
dismissal cases as he   was surprised   when   I   processed   in less than 4
hours the 7 cases he gave me   on 03/28/2007.    Apparently,   Emily,   you
were also assigning me   cases to process which   proved that you were
also very   much   aware of   my job performance.    If there were
substantial errors   or   if ever I could not close cases   in   a short
period   of time,   the leads   and   the SCTs   could have   already   reported
me   to    Jimenez,   the acting supervisor for Jenita Ford (Jenita is on
leave since the middle   of February 2007).    Undoubtedly,   Jimenez   was
very much aware of   the quality and quantity of   the work I have been doing
since I was reporting to him directly for work assignment.    And if
Jenez   would have   the courage to tell you the truth,   he would say that I was already
proficient   in my assigned duties,   especially   the processing
of dismissal cases,   since   December 2006.
(Proofs:   #1a   discussion,   copies of   processed cases & other work done   Exhibit _2_
Page _7_ of _34_

(still being withheld by the management)
(Witnesses: Emily Montuya, Eric Jimenez, Ron Mieczsnikowski, Diane Ertman, Stacey Bastian and Greg Mikulan)

Further responses to your allegations.

Thus, because of the proximity of my cubicle to your office, in addition to the dismissal cases to be processed and the front desk jobs, you also gave me photocopying, MIMs, filing, purging, and shredding, and other stuff that needed to be done immediately. More often than not, the leads could not give me additional work as they noticed I was always loaded with cases to close and plenty of photocopying you and Jimenez assigned me to do. In other words, you confined my duties mostly on closing cases, photocopying, and filing but never gave me a chance to learn and do other things a case technician should also be doing to assist the judges in accomplishing their tasks. Thus, although you were also aware of my other skills, knowledge, and abilities, you obviously did not give me a chance to use them (e.g., typing/editing the judges' decisions, etc.) to prove that I could do something more for the Agency.
(Witnesses: Emily Montuya, Eric Jimenez and leads Diane Ertman and Stacy Bastian)

Fourth Paragraph of your letter.
(1) Issue: Conduct. (a) "...rude or aggressive towards supervisors and co-workers..."

Responses.

To my knowledge, I was not rude to any of the two supervisors or co-workers at work. I never raised my voice to offend anyone in the office. Your letter did not specify any incident that occurred as to when or who I was rude to. If you would review my emails and Jimenez' emails, you would know exactly who was rude at work. For example, on 11/20/2006, I happened to ask Jimenez more than once about working for credit hours; he got irritated and suddenly yelled at me from his cubicle, "...go back to your desk and work...". I reported this incident to you that same morning but you just took it for granted and did nothing about it. Because of that incident, I requested a meeting with you and Jimenez on 11/21/2006; at first, Jimenez denied yelling at me, but later admitted it when I said there were witnesses. My 12/04/2006 (you have a copy) further describes, without exaggeration, Jimenez' inappropriate actions. Since then, I went through a lot of emotions that I felt I should send him emails and which you may have, perhaps, referred to as rude. Frankly speaking, those emails' issues (Jimenez' and mine) were blown out of proportion after you inaccurately applied your own version on them. For example, you quoted me in one of my emails to Jimenez, "...just stay put.....I'm doing all what I could...okay? Here, I was just trying to communicate with Jimenez in a very casual manner. And to emphasize our personal honesty in dealing with the issues, please read back the emails and you will realize that my email was not a "flippant" (disrespectful) one (which you said it was) but a simple "direct to the point" one. Although you and Jimenez refused to give me a copy of that particular email, I could still vividly remember what was said in his email and in mine. Per his email, he was actually "TELLING me and NOT INQUIRING" about the length of time to finish those four cases; my response was, "... if I were not to do the front desk duties, I could process and mail those 4 cases in less than two hours..." (which is even faster than the 2 hours or more Jimenez had anticipated to do the job). Besides, you could have counselled me if, in your opinion, my statement was offending. But, as usual, I never heard from you just as you let problems at work passed by unresolved. Your allegation that I was rude may have been caused by your deliberate and erroneous dispositions in interpreting the emails' messages, instead of dealing with the truth of the mattter, as presented. Nonetheless, that particular email where you quoted me from also proved that I was ready proficient in my assigned duties, such as, processing dismissal cases in a short period of time (i.e., lesser time for me to do the job compared to Jimenez' more time to finish the job). My emails may have seemed to be tougher and meaner to you, but if you have given them further thoughts and understanding, you would be

3

Exhibit 2
Page 8 of 34

enlightened that my issues were in reality just "The TRUTH -- NOTHING BUT THE TRUTH!" Evidently, those inappropriate actions originated from Jimenez and not from me. I was just provoked to respond. Emily, like you, I am just a human being with emotions and feelings -- subject to err and also subject to react to afflictions!

Eric Jimenez started working for SF-ODAR in October 2006 (the same month I was still on training on closing dismissal cases). During those days, other employees and I have observed that it became his leisure, like a "vulture", to spy on me from time to time just to check what I was doing then counting the number of dismissal cases or discs I had been working on. Sometime in November 2006, I was shocked when he told me the first time (then he repeated making the same remarks for a few times more) that the work I was producing was not worth the "PAY" I was receiving from the Agency. I then replied that I was still a trainee and therefore I was closing cases at my own pace as I have been wanting to learn to do my job well. I also emphasized to him that if an employee is properly trained, he/she will likely to become a good material to the organization/agency. I further mentioned to Jimenez that we are working for the federal government and not for a factory where the workers' wages are computed by the number of pieces they produced. Conversely, there were also times when he would say, "... it's almost 12 noon...is that all you have finish... you cannot move fast why... is it because you are weak or your age... ... you have a lot to do..." Honestly, I did not appreciate Jimenez' remarks as they deterred my goal to do my job properly and expeditiously. Needless to say, Eric Jimenez, according to my sources (names will be revealed upon request), has a pattern of harassing employees he dislikes, like in my case.

Consequently, Jimenez again mentioned the "PAY" issue in our 11/21/2006 meeting with you (noted in my 12/04/2006 email - you have a copy).

Basically, I observed that your presence in any of my meetings with Jimenez was not providing a solution to the problem. It seems that the way you treat problem issues among employees creates an appearance of partiality because you acted more of a note taker than a problem solver. Of course, I am not to tell you what you should have, perhaps, done to resolve problems at work; but, perhaps, you could have offered more flexibility in resolving problems if you, at least, have done some counselling to both parties involved in the issues. But you never did any, so far. (Wiitnesses: Emily Montuya, Eric Jimenez, and Sources - names will be furnished later with permission)

(2) Issue: Conduct. (b) "... refusal to follow instruction..."

Responses:

I could confidently tell you that I have never refused constructive feedback from the two supervisors or leads or co-workers at work. If you recall, I have mentioned to you once or twice that I was truly bent on working hard on my assigned duties and, therefore, I have been interested to receive constructive feedbacks to add more improvement in my assigned duties. But I could not remember any instance that I received or refused feedbacks from you, nor from Ford, nor from Jimenez. I saw to it that I constantly checked with you what you wanted me to do since Jenita Ford's absence, and I never refused your instructions as well as the others'. And since I was also aspiring for promotion, it never came to my mind to refuse constructive feedbacks that would surely lead me to new avenues for advancement. (Witnesses: Emily Montuya, Eric Jimenez, Diane Ertman, and Stacy Bastian)

5th paragraph of your letter.
Responses to: (c) "...extensive assistance ..."

There are two leads -- one for Group A - Stacy Bastian and another for Group B - Diane Ertman. Ertman has already done a lot of assistance especially during my training period. Buty Bastian has not. That is, whenever I needed assistance, Bastian would either say she was busy or giving me all kinds of excuses. For example, when Ertman was on leave in January 2007, I asked Bastian to assist me to close an electronic case file, she

4

Exhibit 2
Page 5 of 34

reasoned that she was busy, so I asked Rose Yip to assist me, instead. Yip was surprised why Bastian could not help. Although Jenita Ford instructed Bastian to train me on electronic files, Bastian did not comply completely. She did it on a piece meal basis and never completed the training with me. On another occasion, I asked her about a disposition Judge Gaye made because I could not "...move on to close a case; instead of helping me, she just told me, "...see the judge, ...see the judge..." Jimenez heard my conversation with Bastian and he could not deny that. That email I sent to Bastian sometime in February 2007 (you have a copy), describes how she treated a case problem and also how she had been treating me at work. Actually, I was quite hesitant to send that email to Bastian because I was cautioned by a few co-workers that Bastian is a close personal friend of Judge Parks since they were together in Oakland. But because I wanted to inform Bastian what actually transpired when she panicked on handling a particular case problem, as described, without exaggeration, in my 02/26/2007 email (you have a copy), I still sent it to her with the thought that, perhaps, Judge Parks would judiciously exercise his power in judging the situation fairly.
Witnesses: Jenita Ford, Eric Jimenez, Stacy Bastian, and Rose Yip)


CONCLUSION.

Emily, in view of the reasons, witnesses , and proofs/evidence I have presented on this report, I strongly believe that you have formed a biased decision with your false allegations as your ammunitions to terminate my employment. In your position as the ODAR's Hearings & Appeals director, people would assume you are aware that you cannot just fault a person with any wrongdoing without sufficient accurate evidence. The fact that I never had any counselling with you about my job performance or conduct, it clearly indicates that you used your power to protect your position and acted like a rubber stamp for those you wanted to please and protect as well. Evidently, I also believe that deception of any kind in dealing with the issues is not good, just as power and wealth are not everything in this world, I am pursuing this case, therefore, to seek justice through the OCREO. I am designating, with his permission, the Union officer, Duane DeJoie, as my personal representative. Thank you.

Corazon S. Pascual
(former SSA-SF-ODAR employee)


The average US Credit Score is 675. The cost to see yours: $0 by Experian.
http://www.freecreditreport.com/pm/default.aspx?sc=660600&bcd=EMAILFOOTERAVERAGE

Exhibit 2
Page 10 of 34

**Pascual, Corazon**

| | |
|---|---|
| From: | Pascual, Corazon |
| Sent: | Monday, December 04, 2006 8:36 AM |
| To: | Jimenez, Eric |
| Cc: | Montuya, Emily; Ford, Jenita |
| Subject: | Issues |

My training in closing and mailing cases took place in the latter part of September 2006 and I started working on closing cases in October 2006. Additionally, I also do MIMS, files (purge/shred), photocopies, and other things. In November 2006, I requested to be transferred to Group B because my trainers are in your group. The early part of my stay went on smoothly until problems popped up.

The foregoing indicates that I have been in your group for barely a month' time -- more or less. You came aboard in October 2006. I wonder how you could have prejudged my work performance in so short period of time. You, as a supervisor, should know better than I do that job performance appraisal is done after a year or at least after six months. What you have done reminds me of your bragging in your action of firing employees from your last job. I didn't know the whole story of what you did then. But I believe it would be better not to prejudge or underestimate your subordinates or fellow employees' capability in a very short period of time to prevent mistakes from happening in your misjudgments.

Your being engrossed with the issues of gossips (Erlinda Molar's) is causing a lot of arguments as there is blame that goes around here and there. Not only that, your irrelevant emails are affecting my workflow as I have to stop just to respond to you on the computer. Your frequent order for me to see you about gossips also deter my intention to be productive so I can submit my finished work in a timely fashion.

Your made up issues absolutely cause inconvenience on my part. In our meeting on 11/21/2006, you reported to Emily that you and I met with Judge Parks to discuss my job 'rformance. , I responded to you that I couldn't recall of any -- your issue was completely false! I could plausibly understand your being forgetful in many instances of what you did but making up inaccurate issues such as this one is a serious matter. You, as an ODAR supervisor, should take time to be concerned about it as it is not only embarrassing but quite shameful on your part.

Your raising your voice at me on 11/20/2006 is demoralizing on your part because people around your cubicle heard you and could not believe that you became suddenly irritated for my being repetitive in asking you about credit hours and then yelled at me -- "Go back to your desk and work". At first you denied this issue in our meeting with Emily on 11/21/2006, but later also admitted it after I mentioned that there are witnesses. You seem to have loyalty to yourself and to Erlinda Molar and others for that matter but lack the ability to consider my feelings.

Lastly, as it has been my intention to accomplish my work properly and in an expeditious manner to better serve the claimants, I would request you, therefore, to please stop mistreating (or harassing?) me. If you do not wish to comply with this request, it would mean that you really have a heck of disliking me.

Thank you.

Corazon,

Exhibit 2
Page 25 of 34

1

Pascual, Corazon

| | |
|---|---|
| **From:** | Pascual, Corazon |
| **Sent:** | Monday, February 26, 2007 1:05 PM |
| **To:** | Bastian, Staci L. |
| **Cc:** | Montuya, Emily; Ford, Jenita; Jimenez, Eric |
| **Subject:** | FW: Issues |

| | |
|---|---|
| **From:** | Pascual, Corazon |
| **Sent:** | Monday, February 26, 2007 12:57 PM |
| **To:** | Bastian, Staci L. |
| **Cc:** | Ford, Jenita; Jimenez, Eric |
| **Subject:** | Issues |

As I try to be nice and friendly and patient with you, many of our co-workers have been noticing that you are becoming uncontrollable in your behavior in criticizing me even for the slightest mistakes that I do. Oftentimes, your issues were even inaccurate. For example:

(1) About a week ago, the assistant to a rep/lawyer complained that you hunged up on her while still explaining about the missing pages of the ALJ's decision. She called back so I referred her to you but you were quite reluctant to pick up the phone. Because you could not accept the fact that you actually hunged up on her, you shifted the blame on me by telling me to learn how to talk to lawyers; the person on the line was the assistant to the lawyer and not the lawyer himself; you kept on talking, you did not give me a chance to explain. Anyone would say that what you did to the assistant was plain rudeness on your part.

For your info, I've been trained in the past how to deal not only with lawyers but with people from different walks of life. I became conversant in doing this for a few years. Also, my first job in this office was the front desk for more than five months -- I dealt with claimants and their lawyers and other guests -- attending to their needs, answering their technical or non-technical inquiries or referring them to individuals as appropriate.

In the latter part of September 2006 I was trained and started closing cases in October 2006. Diane and Ron were thorough in showing me from head to toe the different aspects of closing cases. But with you, you have trained me haphazardly on closing electronic files -- so far you have not trained me on anything completely. I just asked help from other co-workers.

(2) Then last Friday, 02/23/2007, you again made a big deal out of a tiny thing that I said about Ron's concern in transporting mails to/from the mail room in the basement. It became your habit to announce openly from your cubicle about anything I say just to satisfy yourself.

The above are just your most recent blunders. There were many more in the past but I have been trying hard to forget them.

Because of how you have been treating me, I would request you that whenever you have complaints about me, please bring them up with Emily. Also, I would appreciate you not to be discussing my mistakes to other co-workers. Thank you.


Corazon Pascual
Legal Assistant(OA)/Case Technician
OAR
415-744-3080

1

Exhibit _2_
Page _26_ of _34_

# AGGRIEVED'S
# NARRATIVE STATEMENT

Exhibit *2*
Page *3* of *34*

FILE NO.: SF-07-0426-SSA

CORAZON S. PASCUAL
(Mail Address: P. O. Box 471454, San Francisco, CA 94147)
(Home-Tel. 415-409-6679, Email: corazonspascual@hotmail.com)

I have thought to submit this brief summary of my case complaint (same issues – harassment and age and national origin discrimination at the workplace), as shown below, to give the official investigator a clearer view of the case. A list of my witnesses' testimonies is shown on a separate cover.

I experienced harassment and discrimination at the workplace during my employment at the SSA SF-ODAR. As I have not previously experienced age discrimination, I do not know it when I saw it and, therefore, I find that it was not easy to prove it because the harasser did his inappropriate acts in his own very subtle ways. He made sure that no one was around (to witness) but me – the victim.

The SF-ODAR group B supervisor, Eric Jimenez (the harasser), joined the Agency in October 2006, the same time I was a trainee in my new job assignment – processing of claimants' dismissal cases. It was during this time when Jimenez started harassing and discriminating me against at the workplace.

## Eric Jimenez' Workplace Harassment.

1.      In October 2006, Eric Jimenez started his verbal insults on me as he verged into my cubicle. He perceived me as an old worker – weak, inflexible, and less productive (re my May 3, 2007 Statements, pp. 1 and 2). Example: During my training time, Jimenez made unjustified and unnecessary comments about the number of cases I processed which, he said, was not worth the pay I was receiving from the Agency (re my April 19, 2007 Response to Emily Montuya's Termination Letter, p. 4, 1st paragraph). He made the same comments in our meeting in November 2006 with the hearing office director, Emily Montuya. I also reported this pay issue to HOCALJ Benjamin Parks in November 2006 but, like Montuya, he did nothing about it.

2.      Jimenez's frequent order to see him in his office and his irrelevant emails distracted my work flow as I had to stop to get to the computer to respond (re my Dec 04, 2006 email to Jimenez).

3.      Jimenez made persistent observing or stalking within my workplace. He acted like a "vulture" to spy on me from time to time - either walking around my cubicle to check what I had on my computer or surprisingly get into my cubicle to count the number of my processed cases. He continued his inappropriate acts until he became successful and got what he had been wanting to happen to me – that I get fired.

4.      Jimenez acted in a most particularly cruel manner when he yelled at me, "...go back to your desk and work..." because that time I asked him twice about credit hours. At first, he denied his inappropriate act but later admitted it when trapped with evidence (witnesses) to prove that he actually did it (re my April 19, 2007 Response to Montuya's Termination Letter, p. 3, 2nd para).

5.      In February 2007, Jimenez also attached his discriminatory motives to his pretentious "friendly email reminders." But how could his emails be friendly? Before his emails, he saw to it that he already dumped bunch of case folders on my desk with his order to finish them quickly. So what was his point of reminding me again the same day. I value supervisor's honesty and fairness in dealing with the employees, but what he had been doing was a mere pretense, so I had thought right then and there that his "friendly emails" (as he calls them) were nothing but a "false show of something ." His hypocritical actions were on his body language especially on his facial expressions.

Exhibit __1__
Page __4__ of __10__

C. Pascual,   Brief Summary of My Case Complaint                                        2/5

<u>Eric Jimenez' Workplace Discrimination.</u>

For the SF-ODAR group B supervisor, Eric Jimenez, harassments were not enough for me to endure. He made me an easy prey on his discrimination perception of my capabilities.

1.      <u>Age.</u>

    (a)     Out of ignorance or bias, Eric Jimenez disregarded my actual state of physical and mental ability to perform.   He relied upon my age to doubt my capabilities, thereby, subjected me to treatment that differed substantially from that of  younger co-workers's.     As I mentioned earlier, Jimenez made verbal insults and perceived me as an old worker – weak, inflexible, and less productive, as evidenced in his remarks (re my May 3, 2007 Statements, pp.1 and 2).     He denied making those remarks because he knew I was alone in my cubicle when he made them and, therefore, no witnesses). Jimenez' denial of his discriminatory acts  is no longer credible, just as how he also denied his inappropriate acts in the past and later admitted them when trapped with evidence (witnesses) to prove his guilt (re my December 4, 2006 email to Eric Jimenez and my April 19, 2007 Response to Montuya's Termination Letter).   Further, since photocopying, filing, purging and shredding of documents were also part of my routines,  he had been telling me indirectly on different occasions that I could perform better on those jobs,  although he knew all along that I had been particularly alert and focused on processing claimants' dismissal cases (Evidence: copies of my processed cases and other work done  -  still being withheld by the management;  re my April 19, 2007 Response to Montuya's Termination Letter).

    (b)     As I mentioned in my earlier report, Eric Jimenez is fond of associating himself with the younger set and making preferential treatments to them.   One example: With Jimenez' false belief that older worker, like me, couldn't be trained anymore effectively,  he had chosen to train a younger employee, Erlinda Molar, on the new codes to process claimants' dismissal cases.   I discussed this issue with Montuya  but I was shocked to hear that she was, in fact, in favor of what Jimenez did (re my Responses to Management's Statements, p. 1, #3).

    The younger supervisor, Eric Jimenez, would also eventually age.   It would be to his own best interests to remove his age-biased conduct from his mind and base his judgments upon the capability of the worker to do the work rather than upon her age. I believe there is no correlation between age and ability to perform, except in those jobs demanding strenuous physical labor. Jimenez may or should have thought that an older worker's performance is at least as and sometimes better than that of a younger worker's.

2.      <u>National Origin.</u>

    (a)     Jimenez singled me out when he habitually made sarcastic comments about my strong unusual accent and manner of speaking (re my May 5, 2007 Statements, pp. 1 and 2).   He never did these to three co-workers of my origin. He made sure he made his criticisms in my cubicle alone.

    (b)     Jimenez centered his defense upon his contention that he could not have possibly discriminated me against on my origin because of his association with Montuya who has the same origin as mine (re my Responses to Management's Statements, p.1, #2).   But Jimenez shrewdly did not consider the fact that he has to deal with Montuya whether he likes it or not - she is his supervisor.   He also did intentionally forget the notion that sometimes people may like a group of people of the same origin, but at the same time also dislike a few of them, like in my case.

    Ironically, there is also a notion that sometimes people of the same origin may not always end up as friends but also as foes, depending on each individual's motives or influence.   There are also some who fight for power with the notion to destroy the reputation of others in order to win and hold on to that power.  These things somehow happen around us, around the country, or elsewhere;  that is, Whites

Exhibit  <u>1</u>
Page  <u>5</u> of <u>10</u>

C. Pascual,    Brief Summary of My Case Complaint.                                3/5

is, Whites may turn against Whites, Blacks against Blacks, Asians against Asians, etc.. Example (Montuya's): With Jimenez' motives, since he got on board in October 2006, he became a strong influence to Montuya (as was observed at the workplace). With Montuya's own motives, too, she fell in with Jimenez's discriminatory intent against me, as discussed earlier (re my Responses to Management's Statements, p. 1, #3). Jimenez's influence on Montuya obviously worked so well. It could have been better, however, if Montuya applied her best judgment in this regard.

---

Emily Montuya's  Unfair/Discriminatory Treatments.

1.      Emily Montuya lied on the basic factual issues of the case in order to adversely terminate my employment on March 30, 2007.    She alleged that my poor performance and unprofessional conduct were the bases for firing me, but her decision had no bases, in fact.   She has no evidence or witnesses to back up her allegations, and it was not until after her decision to terminate my employment when she decided to put my job performance and conduct at issue.

         (a)     Montuya did not value the fact that I was already proficient in processing dismissal cases starting in December 2006 right after my training in November 2006, except during the early part in January 2007, I slowed down due to my health condition (re my April 19, 2007 Responses to Montuya's Termination Letter).    My productivity, according to her, was not as great as that of my co-workers' (who have been on their jobs for more than ten years) was entirely inconsistent with the work I have done while still a trainee and the work proficiency I have demonstrated right after my training (Evidence: Copies of my processed cases – still being withheld by the management).

         (b)     Montuya disregarded my enthusiasm and dedication to my work    Although she was aware that I was knowledgeable and skilled to perform the responsibilities of other related jobs, she neither considered me for nor offered me to be trained in any of them.   She barred me from new and challenging assignments or advanced training like the ones she provided to other employees (re my April 19, 2007 Responses to Montuya's Termination Letter, p.3, 1st para).

         (c)     Montuya's complexity in her issues made her to manipulate the procedure for the standard one-year probationary period for new employees.  I was rated as "successful" on the first half of the year  (re my Responses to Management's Statements, p. 2, #4 ).   On the second half, Montuya did not value the proficiency I have demonstrated in my job beginning December 2006 (right after my training) until she fired me on March 30, 2007.

         (d)     Montuya submitted an inaccurate version of facts that confused her with the real issues of the case  (re my April 19 Response to Montuya's Termination Letter, p. 3, 2nd para)

2.      Emily Montuya has evidently shown her discriminatory intent on the following situations:

         (a)     Montuya favored Eric Jimenez's preferential treatment to train a younger employee on the job's new codes for processing dismissal cases, but did not train me.  As a trainee, I was looking up to Jimenez for assistance, but he just took it for granted  (re my May 14, 2007 Responses to Management's Statements, p. 1, #3).

         (b)     Montuya stopped me from reporting to her about Eric Jimenez's discriminatory acts as she said it was only going to get worse;  she let the problems remain unaddressed.    As I mentioned in my earlier reports, Montuya was unduly soft in resolving issues as she acted like a rubber stamp to please and protect employees she favored and, of course, to protect her position as well.

Exhibit _1_
Page _6_ of _10_

C. Pascual,    Brief Summary of My Case Complaint.                                    4/5

3.       Montuya abruptly altered her decision (in her email) regarding a substitute employee's (Ron Cole) job assignment as acting group A supervisor (for Jenita Ford's LOA).   Her confusing decision made Eric Jimenez the assumed acting and, because I was in group A, it required me time and again to deal with him.  At Jimenez's convenience, he was again at liberty to continuously harass and discriminate me against (re my  Responses to Management's Statements, p. 2, #2).

4.       Emily Montuya  terminated my employment without a job performance appraisal from the assumed acting supervisor, Eric Jimenez.   If Jimenez would have the courage to tell the truth and be honest to himself, he should have given me a good job appraisal since  I was reporting directly to him for work and must be quite aware of the quality and quantity of the work I had been doing while still a trainee and right after my training beginning  December 2006 (re my April 19, 2007 Response to Montuya's Termination Letter).    Montuya's lack of good business reason for not conducting such job performance appraisal created an appearance of impropriety in her position as the hearing office director. Undoubtedly,  Montuya plainly relied on her inaccurate guesswork and hearsays when she wrote that  March 30, 2007 termination letter.

5.       Emily  Montuya did not follow the Agency's internal procedures.   She did not provide me a counseling that could have alerted me that my job performance and conduct at work were not acceptable. This deviation from normal procedures signals  Montuya's pretextual explanation for my discharge.

---

Judge Benjamin Parks's  False Issues.

Because of Judge Park's  narrower perception of the basic facts of the case issues  (re March 30, 2007 Emily Montuya's Termination Letter  and my April 19, 2007 Response to Emily Montuya's Termination Letter), he attacked my job performance and conduct at work  with severe criticisms (re Judge Parks's 3-page report - Management's Statements).    What hurt here is realizing that Judge Parks had chosen to create false issues as pretext to Emily Montuya's untruthfulness in her issues.

One of Judge Parks's false issues was  about my monitoring of his hearings.   He alleged that it was erroneous (p. 2 of his 3-page report re Management's Statements).   Therefore, to rebut his charge, a brief discussion of my escorting /monitoring of judges's hearings  is shown below:

1.       November 2006 - The group A supervisor (Jenita Ford) scheduled me to observe and monitor Judge Parks' hearings with the contract-monitor Bridget Vaughn.   On the 1st hearing, I just observed; then before I monitored the  2nd hearing, the judge asked me to demonstrate the procedure to monitor, and when satisfied, he ordered to proceed with the  2nd hearing.     I monitored with Bridgett sitting side by side with me in the courtroom checking the details of my monitoring -- I had no error from start to finish, according to Bridgett (Bridgett Vaughn is my witness in this regard).

2.       January 2007 – Jenita Ford scheduled me to monitor Judge Susanne Lewald's hearings. But the judge, according to Jenita, did not want me to monitor that time because of my illness (chest congestion and too much coughing).

3.       February 2007 – Jenita Ford scheduled me two times more to monitor two judges'(I forgot the judges's names) hearings which were supposed to be done all by myself, but both did not materialize because on the 1st – the claimant did not show up (no show) and on the 2nd – the judge rescheduled the hearing.

Baragan J. Pascual
Exhibit _1_
Page _7_ of _10_

C. Pascual, Brief Summary of My Case Complaint.                                    5/5

4.      February/March 2007 – The lead-Diane Ertman assigned me to escort Judge Thomas Gaye's claimants; she showed me how the judge wanted his escorting to be done because, according to Diane, each judge has his/her own style; as scheduled, I did the escorting of claimants all by myself for Judge Gaye's, so far no complaints from Judge Gaye. Other co-workers (especially Erlinda Molar and Emily Montuya) thought that Diane trained me again on monitoring business, but absolutely that was not the case – Diane only showed me just once how Judge Gaye wanted his escorting of claimants done.

5.      Since I had not done any monitoring of judges's hearings all by myself, sometime in March 2007, I decided to observe Judge Ashmeyer's hearings through SCT Greg Mikulan. I brushed up my monitoring skills with a contract-monitor Valerie Rideau for about 15 minutes, more or less. Then towards the end of March 2007, I asked Emily Montuya why I was not getting any monitoring job. She told me just to wait - then sadly and unexpectedly, she shocked me with a termination letter on March 30, 2007.

Conclusion

The SSA SF-ODAR management team members's unfair treatments, discriminatory motives and false judgments have apparently become the central issues of this case, as earlier discussed. Judge Parks's allegations are generally of no relevance to the real issues of this case since his issues were false. He completely ignored my rebuttals which he could have used as his guide in judging me, as discussed earlier. Emily Montuya's inaccurate version of the facts and her untruthfulness in her own issues are not credible reasons to terminate my employment as they were so implausible and they must be pretextual, as discussed earlier. Eric Jimenez's open hostility got him engaged intentionally not only in harassing me relentlessly at the workplace on numerous times but, also, in his discriminatory conduct as he had accustomed himself to use tactics and strategies to conceal his motives, as earlier discussed.

The SSA SF-ODAR management team members, evidently, seem to have forgotten their reasons for doing things that conflict with who they are and what is important to the Agency - the SSA's policy prohibiting discrimination against employees. As implemented, the Agency's objective policy "ensures that every employee enjoys a non-hostile work environment - free of discrimination or harassment of any kind."

Consequently, the SF-ODAR management team members rendered an unjustified action that ultimately took everything off me - a loss of my income capacity to support myself and my loved ones with dignity - to work hard and be valued accordingly, inability to find employment due to the record they caused in my employment file and , worst of all, the inconvenience they have caused me to experience mental and emotional distress.

*Corazon S. Pascual*

Exhibit  *1*
Page  *8*  of  *10*

CORAZON S. PASCUAL
P . O . Box 471454
San Francisco, CA 94147
corazonspascual@hotmail.com

During my employment with the SF-ODAR, I have complied with the Agency's rules and regulations as presumed to be part of my employment contract. I performed my duties, as assigned, to the best of my ability.   This time, however, I am presenting reasonable bases and proofs to dispute the management's decision to terminate my employment on March 30, 2007.

I certainly do not blame the whole SF-ODAR for the substandard work of one supervisor (and, possibly, also of the Hearing office director) who undoubtedly used his harassment technique to treat me differently on numerous occasions at the workplace.   The difference in his treatment is based on discrimination as discussed on my attached 04/19/2007 rebuttal and 04/21/2007 statements, and also on this report). As it is my intention to pursue this case in good faith, I am submitting, therefore, these needed responses to the statements of the SF-ODAR management team members (HOCALJ Benjamin Parks, Hearing Office director Emily Montuya, and Group B supervisor Eric Jimenez).

Eric Jimenez's Discriminatory Actions.

As discussed in my 04/19/2007 rebuttal and 04/21/2007 statements, Eric Jimenez harassed me relentlessly on different occasions then ultimately discriminated me against in his own very subtle ways. His harassment and discriminatory actions are shown below:

1.   It was already proven in the past (re my 04/19/2007 rebuttal) that everytime Jimenez does an inappropriate act or says something discriminatory, he has the tendency to either intentionally forget it or deny it.  Here, he applied again his technique as he denied saying a discriminatory remark against me as quoted from my 05/03/2007 statement, 2nd para, 4th sent..

2.   Jimenez became defensive in his statements that Montuya has the same national origin as mine with the notion of evading the issues of his harassing and discriminating me against.  He shrewdly implied in his statements that he could not have possibly discriminated me against because he also deals with Montuya (who has the same origin as mine) as a management team member.  Jimenez is forgetting, though, the notion that people sometimes or oftentimes could possibly be nice to a group of people of the same origin but at the same time dislikes one or two of them, as well.

3.   Jimenez undoubtedly also showed a preferential treatment to a younger employee, Erlinda Molar (his friend and who also has the same origin as mine ).  Before he left for his holidays' vacation in December 2006, he trained Molar on the new coding procedures in closing dismissal cases.   No one (including myself) knew about it until it was brought up in our staff meeting with Emily Montuya.   I asked Montuya why Jimenez trained Molar but did not train me.   Montuya replied that Jimenez felt that since Molar has enough experience than I do she could easily pick up.   I responded that there is no clear-cut way to measure one's ability regardless of Molar's length of experience;  besides, I was the one who needed help so badly being a fairly new employee then and was still a trainee on closing dismissal cases.  I further emphasized to Montuya that anything could be learned from the start. Montuya did not want to hear my reasons, she said I was argumentative.  I said finally that I could be argumentative but for the right reasons only.   Further, on one occasion I talked to Jimenez over the phone about a copy of my email I sent him; he said he couldn't give me,  neither Montuya could , because, according to Jimenez, Montuya is doing only what he's telling her to do.   Since then, I was having a feeling that I was being treated differently not only by the Group B supervisor Eric Jimenez but, possibly, by the Hearing Office director Emily Montuya, as well.

Because of the foregoing, I have also been having a feeling that my employment termination on March 30, 2007 was Montuya's and Jimenez's orchestrated effort.

*Corazon S. Pascual*
05/17/2007

1

<u>Emily Montuya's Discriminatory Actions.</u>

1.    Montuya's statements are not only out of context but, also, do not show bases and evidence to support her false allegations against me.   For example, in her new made up issue, she said she counseled me many times regarding my conduct and performance at work (when? never!);   then she also said that Jenita Ford and Eric Jimenez monitored my performance and also counseled and trained me (when? none that I know of!).    The lead Diane Ertman and SCT Ron Miecznikowski were my trainers and they were also the reason why I requested to be transferred to Jimenez' Group B (where Ertman and Miecznikowski belong)  from Jenita Ford's Group A at first, then I requested again to be transferred back to Group A (Ford's) when  Jimenez started  his harassing and discriminating me against (as discussed in my 04/19/2007 rebuttal).    Thus, Montuya should know better than I do that when a supervisor counsels an employee on important matter, she/he should document it and let both parties sign.   Montuya has no evidence or documentations because her made up issues did not happen.   She is now trapped with her own inaccurate guesswork and hearsays and ended up arguing in her statements  her alleged rudeness to my co-workers and incompatibility with my supervisors.    Montuya's made up issues became increasingly irrelevant as she also added new issues of "gossiping and giggling and telltale" at the workplace in her statements.   Perhaps, like Judge Parks, she also ignored my 04/19/2007 rebuttal, or maybe she just simply refused to follow the logic of the issues' discussions, as presented.

Emily Montuya, however, did not realize that her above-mentioned issues are not good cause for dismissal.    She has no proofs or documentations of any kind to justify her biased decision to wrongly terminate my employment.   Any competent manager or director (like in her position) must have already been aware that rudeness and incompatibility with the employees or supervisor is not a good cause for firing an employee  if based on discrimination.  Here, it is quite clear that she has no bases or evidence justifying her decision to terminate my employment  but only her made up issues which are certainly considered as discriminatory, as discussed.

2.    Further, while it is true that Emily Montuya announced in her email that a temporary substitute (Ron Cole) would supervise Jenita Ford's Group A during her absence from February 2006 till May 2006, that thing did not happen because she assigned Ron Cole a different job from the start of his duty at SF-ODAR.    Because of Montuya's confusing decisions, it turned out that Jimenez also supervised Group A (where I belonged) in addition to his own Group B which, as result, gave him more liberty to continue harassing and discriminating me against.

4.    It was also true that in January 2007 I requested to be  transferred back to Group A (Ford's) from Group B (Jimenez's) for the reasons that I wanted not only to let the conflict of interest or friction matter between Eric Jimenez and myself get past but, more so, to avoid Jimenez' discriminatory acts against me. Although Montuya was already aware of the situation, she did not get involve to stop Jimenez to show that his inappropriate actions were being taken seriously.    In other words, Emily Montuya could have protected me from the harassment and discrimination of the Group B supervisor, Eric Jimenez, if only she did her managing and supervising of the employees's problems at the workplace effectively.

5.    Further, I believe the Hearing director, Emily Montuya, also discriminated me against on the evaluation of my work performance.  As mentioned in my 04/19/2007 rebuttal, the Group A supervisor, Jenita Ford, evaluated my first six months work (April 24/2006 – October 24/2006)  as "successful". During the six- month period, my assigned job was the front desk (as discussed in my 04/19/2007 rebuttal).   On the second half of the one-year probationary period (November 26/2006-March 26/2007) I was a trainee from October 25/2006 – November 26/2006 assigned to do a completely different technical job – " processing dismissal cases" and "monitoring judges's hearings" (as discussed in my 04/19/2007 rebuttal).    In other words, my first six-month front desk job assignment was evaluated as successful;   then, I was evaluated on a new technical position for barely four months (from December 26/2006 to March 26/2007). Montuya should have taken into account that probationary period for new employees is one year (based on a continuous same position).   Obviously, have been denied of the normal standard requirement of the probationary period process.

Needless to say, in March 30, 2007 she forcefully asked me (in front of Judge Parks) to sign a termination letter . I requested to allow me to read it and I was given two minutes; afterwards, Montuya told me to pack up my things in 3 minutes then called the security guard to escort me out. What she did was a detriment on my part.    The whole office was shocked as they saw how Montuya treated me -- I was driven out of the office the way as if I have committed a crime. What happened on March 30, 2007 came to me like a lightning -  a sudden impact and shock!


Judge Benjamin Parks.

1.    In his introductory statement, the judge talked about how to avoid discrimination  and  added that he will not tolerate discrimination to happen at the workplace. Judge Parks, however, was not aware that one of his team members, Eric Jimenez, had already discriminated  me against  (age and origin)  in addition to the harassment he did on  numerous times since he got on board in October 2006. Since the judge is not to watch (or "to baby sit") the activities of any of his team members, he has no way, therefore, of finding out what course of action each is inclined on doing or engaging in unless such action is  brought up to his attention.

2.    The judge,  on his 2nd paragraph,  apparently  ignored my proofs/evidence and witnesses as laid out in my 04/19/2007 rebuttal and 04/21/2007 statements.   He has chosen to just  go  along with the false allegations of Emily Montuya  in spite of my reasonable justification based  upon my evidence and witnesses  as discussed  earlier.

3.    Judge Parks, on his 3rd paragraph, thwarted what actually  transpired in our  November 2006 meeting. That time  I brought up  to his attention  Jimenez' harassing me on different issues,  for example, the "Pay issue" (re my 04/19/2007 rebuttal).  Before our meeting ended, the judge said he'll take care of the problems,  but like Emily Montuya's , he did nothing about them.

4.    On the  4th paragraph, the judge created issues.    I do not want to pass a judgment, but I could not penetrate how and why a HOCALJ,  like Judge Parks, would create  a story that apparently did not happen. Basically, the Group A supervisor, Jenita Ford, sent me only once  in November 2006 to observe Judge Parks'  first hearing and then to  monitor his  second hearing (re my 04/19/2007 rebuttal).    I am submitting  the name of the contract-monitor Bridgett Vaughn, as my witness,  whom I have sat with during those hearings.  I challenge the validity of  Judge Parks'  statements  in this regard.

Nonetheless,  the group supervisor Ford also scheduled me  two times more in February 2006 to monitor hearings,  but both  did not materialize because on the 1st  -  the claimant did not show up (no show) and on the 2nd - the judge rescheduled the hearing.    And since I have not done any monitoring jobs  since November 2006, I decided on my own volition to observe Judge Ashmeyer's hearings through SCT Greg Mikulan. I stayed for about fifteen minutes  to brush up my skills with the contract-monitor Valerie Rideau. I again announced to Montuya  my  readiness to monitor any judge's hearings, but , as usual, she did not say much.

Moreover,  I also had an opportunity to serve Judge Gaye's in his hearings/escorting business.  The lead Diane Ertman  showed me how  the judge wanted the escorting  done  because, according to her, each judge has his/her own style .  Other co-workers thought that Diane trained me again on monitoring hearings,   but that was not the case -- escorting only for  Judge Gaye's.


Consequently,  in Judge Parks  concluding  statements, he mentioned that my interpersonal skills have prevented me from learning my assigned duties in a competent manner. If only the judge took time to read carefully  my 04/19/2007 rebuttal, he would be saying otherwise,  because if I  am not  competent enough,  I  could  not  be  able to close and mail  7-8 (or more) dismissal cases each day (7 is the maximum).   Judge Parks's  statements  here are, evidently, nothing  but a pretext  in order to camouflage the false allegations of his team member, Emily Montuya.

05/17/2007

3

I have always respected Judge Parks in spite of his one time uncalled-for yelling at me one morning in January or February 2007.    That time I was delivering case folders to the leads when the front desk phone rang many times as I could not pick up the calls immediately  because no one has informed me that the phone headset I had on that time was out of order.  As a result, the judge was irritated and did the yelling and, more so,  did not want to hear my explanation.    Because the judge's voice was too loud, his yelling was heard by many employees who were around  and they could not believe that the SF-ODAR HOCALJ  could do  such thing at the workplace.  That was the second time I was yelled at (the first by Eric Jimenez  (re my 04/19/2007 rebuttal and the second by Judge Parks as mentioned on this report). Some of my co-workers suggested (as they did on the first)  that I should  file a grievance with the Union  - but I did not just as I did not also on the first.    I had just thought  of forgetting the inconvenience the yellings had caused me.    As the days went by, I still showed  my usual respect and readiness to serve Judge Parks  and, more importantly,   I also let him feel that I have already forgiven him for that unpleasant act he did in the past.

_[signature]_
05/17/2007

4

SOCIAL SECURITY ADMINISTRATION

COMPLAINT OF DISCRIMINATION

**NATIONAL ORIGIN – RACE - AGE**

CORAZON S. PASCUAL, SF-07-0426-SSA

DATE: **APR 1 4 2008**

This notice tells you about your right to appeal the Social Security Administration's (SSA's) final decision in your discrimination complaint(s).

Within **30 days** of your receipt of SSA's final decision, you have the right to file an appeal with the Equal Employment Opportunity Commission (EEOC). You should use the enclosed EEOC Form 573, Notice of Appeal/Petition to do so, and should indicate what is being appealed. You may file an appeal by mailing the appeal to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> P.O. Box 19848
> Washington, D.C. 20036

> or by delivering the appeal to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> 1801 L Street, N.W.
> Washington, D.C. 20507

Appeals of less than ten (10) pages may also be faxed to (202) 663-7022.

**A copy of your appeal must be provided to SSA when you file your appeal with EEOC.** Send a copy of your appeal to:

> Associate Commissioner
> Office of Civil Rights and Equal Opportunity
> Social Security Administration
> P.O. Box 17712
> Baltimore, Maryland 21235-7712

**You also have the right to file a civil action in an appropriate U.S. District Court:**

- Within **90 days** of receiving this final order or final decision if no appeal is filed with EEOC, or
- Within **90 days** after receiving EEOC's final decision on an appeal, or
- If more than **180 days** have passed since an appeal was filed with EEOC and no final decision has been made.

If you decide to file a civil action and you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you. You may also ask that the Court permit you to file the action without payment of costs, fees, or other security. **Granting or denying your request is within the sole discretion of the Court.** Both the request and the civil action <u>MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS</u> of the date you receive the final order or final decision from SSA or the EEOC's final decision. Filing a request for an attorney does not extend your time in which to file a civil action.

**If you file a civil action, you must name the Commissioner of Social Security, Michael J. Astrue, as the defendant. Failure to name the Commissioner may result in dismissal of your case.** If you file a civil action, administrative processing of your complaint will end.